UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MRI SOFTWARE LLC, | ) | Case No. 1:12-cv-01082-CAB |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **PLAINTIFF'S MOTION TO SHOW** |
| LYNX SYSTEMS, INC., | ) | **CAUSE WHY DEFENDANT SHOULD** |
| | ) | **NOT BE HELD IN CONTEMPT OF THE** |
| Defendant. | ) | **NOVEMBER 9, 2012 INJUNCTION** |
| | ) | **ORDER** |

Plaintiff, MRI Software LLC ("MRI"), respectfully submits this Memorandum in Support of its Motion to Show Cause Why Defendant, Lynx Systems, Inc. ("Lynx"), Should Not Be Held in Contempt of this Court for violating the November 9, 2012 Stipulated Injunction Order (herein, the "Order").

## I.     INTRODUCTION

In May 2012, MRI filed its Complaint and Motion for Preliminary Injunction to redress its claims for copyright and trademark infringement, false advertising, misappropriation and other related causes of action. Through discovery, Lynx admitted to much of the conduct complained of by MRI. Through several weeks of negotiation in October and November, the parties agreed upon a Stipulated Injunction Order to resolve the issues raised in MRI's Motion for Preliminary Injunction. The Court entered the Order on November 9.

Paragraph 7 of the Order states: "Within twenty-one (21) days from the entry of this Stipulated Order, Lynx shall certify to the Court its compliance herewith." "[H]erewith" unambiguously refers to the terms of the Order, *in toto.* On the twentieth day, Lynx filed a certification (Doc. No. 37), which merely stated that Lynx "has complied with the destruction requirements of Paragraph 1," and was completely silent as to Lynx's compliance with the

remainder of the Order. Lynx's violation of the definite and specific order of the Court requiring Lynx to certify to its full compliance provides a first ground for contempt.

Lynx's failure to certify its compliance is more than a formality. In recent weeks, it has become increasingly apparent that Lynx is *not* in compliance with the balance of the Order, but rather is carrying on business as usual in blatant disregard of the Order. Providing additional grounds for contempt, Lynx has failed to stop advertising and distributing its infringing "Lynx Products," failed to stop offering and providing prohibited services to Master Agreement Signatories, failed to stop accessing MRI Software installed on the computers of Master Agreement Signatories, failed to stop falsely representing its relationship with MRI, and failed to stop making knowingly false statements to the market.

The evidence clearly and convincingly showing Lynx's violations of the Injunction Order is set forth in detail in the declarations of Georgia Yanchar, Patrick Ghilani, and David Post, which are attached hereto as Exhibits 1 through 3, respectively.[1] Supporting documents are attached to the foregoing declarations. The evidence includes, *inter alia*, multiple Lynx-precipitated requests from Lynx-MRI customers showing Lynx is continuing to offer prohibited services, Lynx's current website, and Lynx's December 18, January 10 and January 25 mass communications to the real estate software market.

MRI attempted to address Lynx's misconduct without the Court's involvement, but Lynx has failed to either acknowledge or purge its contempt. Yanchar Decl., ¶¶ 7, 8, 10-12. Accordingly, MRI brings this motion respectfully requesting that Lynx be ordered to show cause as to why it should not be held in contempt of the Order, and failing such a showing, an Order requiring Lynx to purge its contempt as set out in more detail below.

II. **LEGAL STANDARD**

In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order. *Glover v. Johnson*, 934 F.2d 703,

---

[1] Concurrently herewith, MRI has filed a motion to submit the February 5, 2013 Declaration of David Post under seal.

707 (6th Cir. 1991). "A litigant may be held in contempt if his adversary shows by clear and convincing evidence that 'he violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590-91 (6th Cir. 1987). "The test is not whether defendants made a good faith effort at compliance but whether 'the defendants took all reasonable steps within their power to comply with the court's order.'" *Glover*, 934 F.2d at 708. (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir.1989)).

### III.   ANALYSIS

As set out below, clear and convincing evidence shows that, in addition to failing to certify to its compliance with the Order, Lynx has violated, and continues to violate, several definite and specific terms of the Order.

**A. Lynx Is Knowingly Violating Paragraphs 2(b) and 2(k) of the Order By Continuing to Distribute and Advertise Its "Lynx Products."**

As set out in MRI's Motion for Preliminary Injunction Order, when MRI's Complaint and Injunction Motion were filed last May, Lynx's website advertised "Lynx Products," including the "Product List-MRI." *See* Doc. 1-6 at p. 33 (Lynx's website as of 5/1/12). Through discovery, Lynx admitted sixteen of its "Lynx Products" were developed using MRI Software. The foregoing acknowledgement is recited in the preamble of the Order, and the sixteen infringing products are listed in Exhibit A thereto. Paragraph 2(b) and 2(k) of the Order thus prohibit Lynx from "copying or distributing any copy" of the listed "Lynx Products," and from "making any reference to them," or from "offering or advertising" them on any Lynx website.

Lynx's current website clearly shows that Lynx is continuing to advertise and distribute the listed "Lynx Products" in violation of the Order. *See* Yanchar Decl, Exh. C at p. 22 (Lynx's current website). It appears that, rather than removing the infringing "Lynx Products" from its website and stopping their distribution, as the Order required, *Lynx instead just moved them under a different heading on its website.* A comparison of Lynx's prior and current website shows that, instead of clicking on the "Lynx Products-List" link, visitors now click on a new link, called

"Customize," to access *the very same 16 products*.  *Compare* Doc. 1-6 at p. 33 (Lynx's website as of May 1, 2012) and Doc. 35-1 at p. 4 (Exhibit A to Order with "Product List-MRI") *to* Yanchar Decl, Exh. C at p. 22 (Lynx's current website with "Customize" heading).  Lynx's continued advertisement and distribution of the products listed in Exhibit A to the Order provides a second independent ground for holding Lynx in contempt of this Court.

### B. Lynx Is Knowingly Violating the Order by Accessing the MRI Software and Providing Prohibited Services to Master Agreement Signatories.

As set out in MRI's Complaint and Injunction Motion, a large majority of MRI's customers have signed license, maintenance and support agreements with MRI since September 2010, in a form substantially identical to the "Master Agreement," which was filed under seal as Exhibit C to MRI's Complaint.  *See* Doc. 6-3 at ¶ 16 (5/1/12 Post Decl.).  These agreements prohibit third parties, such as Lynx, from accessing or using the client's instance of the software without MRI's consent.  *See* Doc. 15, at ¶ 1.7 (Master Agreement).  As to MRI's customers who remain in agreements that predate September 2010, many of their agreements also prohibit third party use.  Doc. 6-3 at ¶ 16  (5/1/12 Post Decl.).[2]

Through discovery, Lynx admitted to numerous instances in which it accessed and used MRI Software residing on computers controlled by customers who had signed the Master Agreement.  Accordingly, paragraphs 2(c), 2(d), 2(e) and 2(g) of the Order prohibit Lynx from performing many services on behalf of "Master Agreement Signatories," including:[3]

> c. accessing, attempting to access or knowingly facilitating any access to any instance of the MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory;

---

[2] Indeed, like the Master Agreement, the form customer agreement that was attached to the 2002 Agreement between Lynx and MRI similarly prohibited customers from allowing any third party to use the Software without "written consent of MRI."  *See* Doc. 1-3 at p. 32, ¶ 2 (Ex. D to 2002 Lynx-MRI Agreement).

[3] The Order defines Master Agreement Signatory as "any third party who has been or is hereafter identified in writing by MRI to Lynx as having entered into an agreement with MRI to receive software maintenance, support or consulting in or after September 2010 on terms substantially similar to the 'Master Agreement' filed under seal by MRI with the Court or terms that otherwise prohibit third parties from accessing the client's instance of the MRI Software."

    d.    creating, developing, distributing or implementing any Customization on behalf of any Master Agreement Signatory;

    e.    implementing or assisting with the implementation of any Enhancements on behalf of any Master Agreement Signatory;

    \*    \*    \*

    g.    creating, developing, distributing or implementing any derivative work of the MRI Software (including, *e.g.,* any modifications to the MRI Software effected through changes to source code, database schema, stored procedures or metadata) on behalf of any Master Agreement Signatory;

In addition, paragraph 2(h) prohibits Lynx from providing software hosting services for anyone other than four specific companies already named as receiving such hosting services. The foregoing prohibitions, coupled with Lynx's obligation pursuant to paragraph 1 of the Order to destroy any MRI Software in its possession, were intended to eliminate the risk of Lynx's ongoing infringement.

    Lynx has been put on written notice that 1070 of MRI's customers, equaling 82% of all MRI Software licensees, are Master Agreement Signatories. These include 52 of Lynx's 127 customers. Thus, the Order prohibits Lynx from providing the services enumerated above on behalf of the large majority of MRI Software users overall, and nearly half of Lynx's MRI client base.

    Near the end of the parties' negotiation of the Order, Lynx requested that an exception to paragraphs 2(c), (d) and (e) be added to the Injunction Order, which would permit Lynx to perform the recited acts on behalf of Master Agreement Signatories, if Lynx first obtained MRI's written consent to do so. Stated otherwise, Lynx requested that the "written permission of MRI" exception set forth in paragraph 2(a) of the Order be made to also apply to paragraphs 2(c), (d) and (e) of the Order. Yanchar Decl., ¶ 4. MRI expressly rejected the requested exception. *Id.* at ¶ 5. As explained to Lynx's counsel, in view of Lynx's conduct giving rise to the lawsuit, MRI did not anticipate ever providing Lynx permission to perform the enumerated services on behalf

of Master Agreement Signatories. *Id*. at ¶ 6.  Moreover, MRI wanted the Order (and thus, the public record) to be very clear that Lynx was *not* permitted to provide the enumerated services on behalf of Master Agreement Signatories *under any circumstances*. *Id*.  Thus, paragraphs 2(c), (d), (e) and (g) of the Court's Order clearly, unconditionally, and without exception, prohibit Lynx from providing the enumerated services on behalf of *all* Master Agreement Signatories.[4]

On December 18, Lynx issued a press release, which was published on Lynx's blog and elsewhere, stating, *inter alia*:

> Yardi and MRI Users Can Solve Document Management Issues Through SharePoint Solutions
>
> \*     \*     \*
>
> For over a decade, Lynx has been providing the best in support services for property management software users including:  <u>support, training, customizations, assessments, installation of updates, integration of 3rd party software, monitoring, hosting, conversions to name a few</u>. Although **<u>these services continue to be a major focus for us</u>**, we have been increasingly using innovative technologies to increase our clients' efficiency.

Ghilani Decl., Exh. B.  A release containing many of the same statements was issued by Lynx on January 10. *Id*., Exh. C.  Similar language, advertising the same services, also continues to appear on Lynx's website.  Yanchar Decl, Exh. C, p. 8.

The foregoing advertised services overlap the services listed in paragraphs 2(c), (d), (e) and (g) of the Order.  For example, to the extent Lynx accesses a Master Agreement Signatory's instance of the MRI Software to provide the advertised "support," "training," "integration of 3rd party software," or "conversions," such access manifestly violates paragraph 2(c).  Providing the advertised "customizations" on behalf of Master Agreement Signatories is expressly prohibited by paragraph 2(d).  Providing the advertised "[I]nstallation of updates," i.e. "Enhancements," is expressly prohibited by paragraph 2(e).  Any new "hosting" is expressly prohibited by paragraph 2(h).  In short, the Order unconditionally prohibits Lynx from providing almost all of the

---

[4] 2(g) was added to the Order later in negotiations.

advertised services on behalf of most MRI Software users.  Yet, after the Order, Lynx has continued to advertise that such services "continue to be a major focus for us."

Moreover, after the Order, MRI began receiving numerous requests from Master Agreement Signatories asking that Lynx be provided permission to perform prohibited services, such as those advertised by Lynx on December 18 and January 10, including accessing MRI Software, creating Customizations and assisting with the implementation of Enhancements, on behalf such Signatories.  These requests are described in the Sealed Declaration of David Post. Exh. 3 (s*ee* footnote 1, *supra).*

Accordingly, on January 15, undersigned counsel wrote to Lynx's counsel, bringing the foregoing customer requests to Lynx's attention and seeking assurances of Lynx's compliance. Yanchar Decl., Exh. A.   MRI told Lynx that MRI had, of course, **not granted** any such customer requests, since Lynx's provision of such services to Master Agreement Signatories was expressly and unconditionally <u>prohibited</u> by the Order.  MRI requested a prompt response to its letter. *Id.*

Without responding to MRI's letter, ten days later, on Friday, January 25, Lynx sent another communication to the real estate software market.  Ghilani Decl., Exh. D.   This letter appears to have been sent by Lynx to a broad audience, including not just Lynx's clients, but the real estate software market at large. *Id*. at ¶ 8.  Lynx's January 25 Letter confirmed MRI's fears that Lynx was actively encouraging Master Agreement Signatories to come to Lynx for the services expressly and unconditionally prohibited by the Order.

With reference to clients whose agreements prohibit third party access i.e., "Master Agreement Signatories," the January 25 Letter states:

> Lynx is also not allowed to *load any enhancements* onto your system *without MRI's approval.* Lynx is also not allowed to *create any new customizations* or to fix any existing bugs or problems in the MRI software using your copy of the MRI Toolkit *without MRI's approval*.

*Id.* (Emphasis added).  Lynx's January 25 communication also states:

> For clients that have signed the "new SMA," *MRI can still authorize Lynx Systems to provide support to you at their discretion*. To request approval, we

> suggest that you contact your MRI Client Manager. Failing this, we recommend that you either call or send emails to their supervisor or to the VP of Professional Services at MRI. For any existing client that wishes to sign the new SMA agreement, you may wish to negotiate with MRI to have the restriction deleted from the agreement or have Lynx approved as an authorized supplier before you sign the agreement.

(emphasis added.) As discussed above, during negotiations of the Order, Lynx requested an exception in the Order that would have permitted Lynx to perform the recited services, if Lynx first obtained MRI's written consent to do so, but MRI *expressly rejected* such an exception. Nonetheless, flouting the Order, Lynx is now telling the real estate software market, including MRI's clients, that Lynx may continue to provide the prohibited services, if MRI agrees. In fact, Lynx's provision of the prohibited services to Master Agreement Signatories violates this Court's Order, *under all circumstances*.

Moreover, as with the services advertised in Lynx's December 18 and January 10 communications, the services advertised in Lynx's January 25 Letter even more explicitly violate the Order. "[L]oad[ing] enhancements" and "creating any new customizations" on behalf of Master Agreement Signatories -- as advertised in the above quoted paragraph -- fall squarely within the clear *and unconditional* prohibitions of paragraphs 2(d) and 2(e) of the Order.

Likewise, the next paragraph of Lynx's January 25 Letter advertises services that fall squarely within paragraph 2(c)'s prohibition on "accessing, attempting to access or knowingly facilitating any access to any instance of the MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory."[5] The paragraph of Lynx's letter reads:

> **If you have signed the new SMA agreement after September 1, 2010, but have not received approval from MRI as yet, Lynx Systems can still provide you with excellent training and hotline support services** through on-line Webex sessions and we can still provide comprehensive reviews or assessments of your current usage of the MRI system. . . . We can also build **new reports and customizations** using third party tools such as **Microsoft SQL Server Reporting Services ("SSRS")** and **Microsoft SharePoint**. In addition, we can build completely new applications and sophisticated workflow systems in SharePoint

---

[5] Paragraph 3(a) of the Order defines "MRI Software" as "all Computer software (including all object code, source code, database schema, stored procedures and metadata, documentation and related files and materials, embodied in any medium) created and/or offered by MRI, exclusive of commercially-available third-party software."

and link them into your MRI database. We can also provide **full data conversions** into and out of the MRI database.

(underlined emphasis added). "WebEx" is software offered by Cisco Systems. Cisco's promotional website advertises that Webex software allows users to "share anything on your computer... files, apps, your whole desktop," view others' "desktops or applications -- even when they're not at their desks," and even "view and control remote desktops... troubleshoot software and systems in real time along with the customer." Yanchar Decl, Exh. F.  Using a WebEx session, anything on the client's computer is visible on Lynx's computer, as if Lynx's customer service representative was sitting right next the employee of the client. Ghilani Decl., ¶ 12. Thus, using WebEx, Lynx's customer service representatives are able to work within the MRI Software *just as if the software was on Lynx's own computer.*   Id., ¶ 14.  Not only do Webex sessions allow remote viewing of the MRI Software, in a typical Webex session, Lynx would also be able to *exercise control* over the MRI Software running on the client's computer.  Id. , ¶ 13.  Without such access, supporting the MRI Software remotely would be an extremely tedious proposition. Id., ¶ 15.  Where, as here, Lynx does not have its own copy of the MRI Software on its computers (paragraph 1 of the Order required Lynx to destroy its copies), it would be nearly impossible for Lynx to provide effective support to Master Agreement Signatories without viewing their instances of the MRI  Software. Id., ¶ 15.  In addition, not only is Lynx actively promoting its ability to provide support for Master Agreement Signatories using Webex sessions, on January 29, Lynx *admitted* that at least one such session has actually occurred.   Yanchar Decl., Exh. D.

The word "access" is clear and well-understood.  It means, simply, reviewing.  *Robert R. Jones Associates, Inc. v. Nino Homes*, 858 F.2d 274, 277 (6th Cir. 1988).   In this Circuit, even having the "*opportunity* to review the protected material" is sufficient to establish "access."

{01837324.DOC;5 }                                                      9

*Id.* (emphasis added); *see also* 4. *Nimmer on Copyright* §13.02[A] n. 6 (2010) (citing multiple cases). There can be no question that WebEx sessions allow Lynx to review MRI Software residing on any computer owned or controlled by Master Agreement Signatories. Indeed, WebEx even allows Lynx to *control* the MRI Software. Thus, by using WebEx sessions to provide support to Master Agreement Signatories, Lynx is simply ignoring the Order's prohibition against "*accessing*, attempting to *access* or knowingly facilitating *access* to any instance of the MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory." Indeed, it appears Lynx is using Webex sessions to carry on business as usual, continuing to support Master Agreement Signatories and access their MRI Software, as if the Order did not even exist.[6]

In addition, it is extremely unlikely that Lynx is able to perform the other services advertised in its January 25 Letter -- namely, building reports and customizations with third party tools and "link[ing] them in" to the MRI database, and performing "full data conversions into and out of the MRI database" -- without accessing at least the database schema of the MRI Software installed on Master Agreement Signatories' Computers. The MRI database schema is proprietary and holds not only the specific data points that are utilized and tracked within the MRI Software applications, but also the way MRI categorizes and formats such data points. Ghilani Decl., ¶ 18. To construct a new report, customization or application that links into the MRI Software using a third party tool, such as SharePoint or SSRS, as Lynx advertises, it is necessary to know the details of MRI's database schema. *Id*., ¶ 19. This requires accessing or viewing the table structures within the MRI Software (or having a data map or template that documents MRI's database scheme), which is part of the MRI database schema. *Id*. Likewise,

---

[6] Lynx's repeated use of "direct access" in its January 25 letter - which it indicates (falsely) is only permissible with MRI's approval - as distinguished from access via WebEx - which it claims it can provide without constraint - is pointedly telling of Lynx's disregard for the Order.

visibility and access to the MRI database schema is needed to successfully complete data conversions into and out of the MRI database, as Lynx advertises.  *Id.* ¶ 21.  Without having access to the database schema, it is very unlikely that Lynx could perform the foregoing advertised services.  Ghilani Decl., ¶ 20.  Thus, these services, too, run afoul of paragraph 2(c)'s prohibition on accessing the MRI Software.

In sum, Lynx's December 18, January 10 and January 25 releases, encouraging Master Agreement Signatories to hire Lynx to provide services prohibited by the Injunction Order, are strong evidence that Lynx is in fact, continuing to provide such prohibited services and access the MRI Software in violation of the Order.  In addition, since the Order, MRI has received numerous Lynx-prompted requests from Master Agreement Signatories asking that Lynx be permitted to provide prohibited services on their behalf.  Moreover, Lynx has failed to certify to its full compliance with the Order. All of this points to one conclusion:  *Lynx is continuing to provide services and access the MRI Software in violation of the Order's clear terms.*

**C. Lynx Is Knowingly Violating Paragraph 2(l) And 2(m) of the Order By Making Knowingly False Statements and Misrepresenting Lynx's Relationship with MRI.**

Paragraphs 2(l) and 2(m) of the Order prohibit Lynx from falsely affiliating itself with MRI and from knowingly making any false statements regarding MRI, the MRI Software or MRI's services.   Lynx's December 18, January 10 and January 25 communications constitute clear and convincing evidence that Lynx is in violation of these provisions of the Order.

First, the Order unconditionally prohibits Lynx from providing many of the services advertised in Lynx's December 18 and January 10 blog posts quoted above, on behalf of most MRI users.  It is therefore false for Lynx to advertise that it can continue provide such services, as if the Order did not even exist.

Next, the January 25 Letter's reference to "mutual agreement between MRI and Lynx System's," coupled with the omission of any reference whatsoever to this Court, falsely

characterizes the status of the litigation and Lynx's existing relationship with MRI in violation of paragraph 2(l).  The Letter necessarily implies no Court Order even exists, which is false, and thus also violates the Order.

With reference to the parties' so-called "mutual agreement," the January 25 Letter also states:

> "As a result, as of November 9, 2012, any Lynx clients who have the MRI software and have signed the new MRI Software Licensing and Software Maintenance Agreement ("SMA") after September 1, 2010 must get written approval from MRI before a third party support group, such as Lynx Systems, is given **direct** access to your MRI system."

Ghilani Decl., Exh. D (Emphasis in original.)  The foregoing paragraph falsely conveys that the prohibition against third party access to client's instances of software "result[s]" from the parties' "mutual agreement" in the litigation, when in fact, as explained above, the prohibition on third party access is contained in most MRI's users' agreements with MRI, including in agreements entered into both before and after September 2010.  In addition, by repeatedly stressing "direct" access, Lynx's January 25 release clearly implies that *indirect* access to the MRI Software is permitted, which is also false.

As discussed above, the repeated statements in Lynx's January 25 Letter telling customers that Lynx may provide prohibited services to Master Agreement Signatories "with MRI's approval" -- is  also flatly, and knowingly, false.  Adding to the egregiousness of those statements are the facts that  MRI's January 15 letter reminded Lynx that, under the terms of the Order, Lynx *cannot* provide the prohibited services on behalf of Master Agreement Signatories, even with MRI's permission, that that letter went ignored, and that 10 days later, Lynx communicated that very mistruth to the market.  Yanchar Decl., Exh. A and B.  Thus, there can be no question that Lynx's January 25 Letter constitutes a "knowingly false communication," in violation of paragraph 2(m) of the Order.

Finally, it appears Lynx failed to even ask its counsel to review its January 25 communication before disseminating it.  Yanchar Decl., ¶ 10.  Unquestionably, then, Lynx has

*not* taken "all reasonable steps within [its] power to comply with the [C]ourt's [O]rder." *Glover*, 934 F.2d at 708.

### D. Lynx is Violating the Order.

Taken all together, Lynx's failure to certify to its compliance, Lynx's promotion of admittedly infringing "Lynx Products" on its website, Lynx's repeated solicitations to access the MRI Software and provide prohibited services to Master Agreement Signatories, Lynx's failure to consult with counsel before sending mass communications to the market regarding MRI Services, and Lynx's admission as to Webex, constitute clear and convincing evidence that Lynx has *not* taken all reasonable steps within its power to comply with the Court's Order, but rather has continued on a pervasive pattern of disregard for MRI's rights and disregard for the Order's clear terms.

### IV. APPROPRIATE RELIEF

Lynx's communications to the market appear to have been purposefully crafted to injure and interfere with MRI's customer relationships. As explained in the attached declaration of MRI's Chief Executive Officer, David Post, Lynx's mischaracterization of the Order and the status of its legal entitlement to provide prohibited services has already caused irreparable harm to several of MRI's customer relationships. Post Decl., ¶¶ 10-14. As Lynx well knows, the purpose of the Order was to prevent further conduct, which Lynx admitted violates MRI's proprietary rights. By painting MRI as the proverbial "black hat" wearer in communications to MRI's customers, Lynx is obviously trying to coerce MRI to forego the protection of its hard-earned proprietary rights, and permit Lynx to prolong its free ride on MRI's valuable software. Lynx's flouting of the authority of this Court and MRI's rights must stop.

It is settled in this Circuit that one who has acted in a deliberate scheme of defrauding the public should be required to keep a "safe distance" from the margin line of legality.  On a motion for contempt of a trademark injunction, the Sixth Circuit Court of Appeals in *Broderick & Bascom Rope Co. v. Manoff,* 41 F.2d 353, 354 (1930) stated:

> Manoff here, . . . organized and built up a business based upon a fraudulent appropriation of what belonged to the plaintiff. To permit them to continue without interruption, and to the full scope of identity permitted to an honest competitor, would be to preserve for them a good will acquired through fraud. The due protection of trade-mark and similar rights requires that a competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line- even if that requirement involves a handicap as compared with those who have not disqualified themselves.

Likewise here, in view of Lynx's build up of a business based upon misappropriation of MRI's rights, Lynx should not be entitled to enjoy the full scope of conduct due an honest competitor.

Accordingly, MRI respectfully submits Lynx should be ordered to show good cause as to why it should not be held in contempt, and failing such a showing, purge its contempt by: 1) complying with the Order in full, including a full and proper certification thereof to this Court; 2) reimbursing MRI for its legal fees in enforcing the Order; 3) removing its December 18, January 10 and January 25 communications from all places (*e.g.*, Lynx's blog) where they may be accessible; and 4) issuing an ameliorative communication to the real estate software market. As to the fourth request, in undersigned counsel's January 25 email to Lynx's counsel, MRI requested that Lynx immediately issue a formal retraction of its communications, which reads as follows (with no additional language):

> RETRACTION:  "MRI Lawsuit with Lynx  Systems - Clarification and Update"
>
> Dear _____
>
> On January 25, I sent a message to you entitled "MRI Lawsuit with Lynx Systems - Clarification and Update."  I now realize that many of the statements in my message incorrectly characterized the status of the Injunction, and overstated the services the Court has permitted Lynx to continue to provide to MRI Software users.  Lynx's December 18 and January 10 blog posts also contained

misstatements.  Accordingly, Lynx formally retracts the forgoing statements in full.  If you have any questions regarding the lawsuit, I ask that you contact MRI directly.

Yanchar Decl., Exh. B.  MRI asked Lynx to send the foregoing communication to all recipients of its January 25 communication, but Lynx refused.  *Id.*  MRI maintains that such a communication would help to ameliorate the damage caused to MRI's customer relationships by Lynx and diminish the confusion among the real estate software market, including both parties' customers, which has been caused by Lynx's statements.  Post Decl., ¶ 15.  In cases involving intellectual property rights, such as this, there is ample authority for ordering Lynx to issue a corrective statement, such as the foregoing.  *See Kentucky Fried Chicken Corp. v. Famous Recipe Fried Chicken, Inc.*, 157 U.S.P.Q. 697 (N.D. Ohio 1968) (finding defendant in contempt, and ordering defendant to publish statement to correct confusion); *Eastman Kodak Co. v. Photaz Imports, Ltd.*, 853 F. Supp. 667, 679 (W.D.N.Y. 1993) (requiring copyright and trademark infringer to provide notice to its customers and consuming public of true facts); *see also Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 651 (6th Cir. 1982) (§ 43(a) should be applied broadly to effectuate its remedial purpose.)

## V. CONCLUSION

Clear and convincing evidence shows Lynx is violating the clear terms of the Order in numerous respects, including by failing to certify to its compliance and by failing to refrain from 1) advertising and distributing its infringing "Lynx Products," 2) accessing the MRI Software and offering and providing prohibited services to Master Agreement Signatories; 3) falsely representing its relationship with MRI; and 4) making knowingly false statements to the market.  Accordingly, MRI respectfully requests that the Court enter an order requiring Lynx to show cause why it should not be held in contempt of this Court, and to purge its contempt as set forth above.  MRI additionally requests all other relief as the Court may deem just and appropriate.

Respectfully submitted,
DATED:  February 5, 2013
Signature /s/ Georgia Yanchar
Daniel McMullen (0034380)

Georgia Yanchar (0071458)
CALFEE, HALTER & GRISWOLD, LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
dmcmullen@calfee.com
gyanchar@calfee.com

Counsel for MRI Software, LLC

## CERTIFICATE OF SERVICE

I, Georgia Yanchar, hereby certify that a true and correct copy of the foregoing *Memorandum in Support of Plaintiff's Motion to Show Cause Why Lynx Should Not Be Held In Contempt* was filed electronically on February 5, 2013. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                  /s/ Georgia Yanchar
                                                  Georgia Yanchar
                                                  One of the Attorneys for Plaintiff