UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MRI SOFTWARE LLC, | ) | Case No. 1:12-cv-01082-CAB |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| v. | ) | **REPLY MEMORANDUM IN SUPPORT** |
| | ) | **OF PLAINTIFF'S MOTION TO SHOW** |
| LYNX SYSTEMS, INC., | ) | **CAUSE WHY DEFENDANT SHOULD** |
| | ) | **NOT BE HELD IN CONTEMPT OF THE** |
| Defendant. | ) | **NOVEMBER 9, 2012 INJUNCTION** |
| | ) | **ORDER** |

Plaintiff, MRI Software LLC ("MRI"), respectfully submits this Reply Memorandum in Support of its Motion to Show Cause Why Defendant, Lynx Systems, Inc. ("Lynx"), Should Not Be Held in Contempt for violating the November 9, 2012 Stipulated Injunction Order (herein, the "Order"). Lynx's Brief in Opposition to MRI's Motion to Show Cause (herein, the "Opposition") fails to dispute any of the evidence supporting MRI's Motion. The undisputed, clear and convincing evidence shows numerous affirmative acts by Lynx in knowing violation of the Order's unequivocal terms. Instead of disputing the facts that clearly evidence its non-compliance, Lynx attempts to completely re-write the Order to prohibit far less than what Lynx agreed to, and far less than what the Court enjoined. The Opposition confirms that Lynx has not just failed to take "all reasonable steps within [its] power to comply" with the Order, as the law requires, *see Glover v. Johnson*, 934 F. 2d 703, 707 (6th Cir. 1991), but also that Lynx refuses to acknowledge, *or respect,* the terms of the Order as written. *See Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 504 (8th Cir. 2000) ("One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject") (citing *U.S. v. United Mine Workers*, 330 U.S. 258 (1947)). For the reasons set forth in MRI's opening brief, and below, MRI respectfully requests that Lynx be held in contempt of the Order.

### I. Lynx Violated Paragraph 7 of the Order by Failing to Certify Its Compliance.

Lynx has indisputably *not* certified to the Court its full compliance with the Order, as required by paragraph 7 of the Order. Instead, Lynx has certified only its compliance with paragraph 1 of the Order. (Doc. 37.) Thus, the evidence clearly and convincingly -- unequivocally -- shows Lynx has violated a definite and specific order of the Court.

Lynx's only excuse for its failure to certify -- that "the remaining terms are prospective and thus not capable of being certified" --- is entirely unavailing. The enjoining and restraining of paragraph 2 of the Order was *not* prospective. The Order required Lynx to stop the acts enumerated in paragraph 2 (a) - (m) *immediately,* stating that Lynx and its agents "are *hereby* enjoined and restrained." (Emphasis added.) Thus, on or before November 30, Lynx was to certify that *in the prior* 21 days, Lynx had stopped doing those acts. Lynx did not do so, and *has still not done so*.

Moreover, on November 15, six days after the Court entered the Order, counsel for MRI sent a letter to Lynx's counsel, John McLandrich, to confirm Lynx's certification would reflect that Lynx had stopped engaging in the acts enumerated in paragraphs 2(c)-(g) of the Order on behalf of previously identified Master Agreement Signatories. *See* Exh. 1, 3/4/13 Sealed Declaration of Georgia Yanchar (herein, "Sealed Yanchar Decl.,") at ¶11.[1] Mr. McLandrich did *not* write back to say that those provisions were "not capable of being certified," as Lynx now argues (Oppn. at 3), and indeed, never wrote back at all. Thus, Lynx's after-the-fact rationalization should be rejected.

Lynx's remaining argument -- that it "offered to broaden its Notice of Compliance to address the exact concerns raised by MRI" (*Id.*) --- is also unavailing. First, paragraph 7 required the certification within 21 days of the Order, which has long since passed. Moreover, on January 15, MRI requested Lynx to file a certification that complied with the Order. *See* Exh. G to Sealed Yanchar Decl. Lynx did not respond by doing so. Instead, *15 days later*, Lynx wrote a letter arguing that it didn't need to certify its compliance. *See* Exh. G to Sealed Yanchar

---

[1] Concurrently herewith, MRI has sought leave to file the foregoing declaration under seal.

Decl. Thus, the undisputed fact remains that Lynx has still not filed a certification that complies with the Order.

Lynx's characterization of its failure to certify as a mere "procedural quibble" (Oppn. at 3) underscores Lynx's dismissive view of the Order altogether. Lynx's Opposition is tellingly unsupported by any sworn declaration or other evidence that even attempts to dispute the facts set forth in MRI's Motion. Rather, the undisputed evidence clearly and convincingly shows that, in addition to paragraph 7, Lynx has disregarded the letter and spirit of numerous provisions of the Order.

## II. Lynx Violated Paragraph 2(k) of the Order By Continuing to Reference "Lynx-Products MRI" and Offer and Advertise for Resale Customizations.

Paragraph 2(k) of the Order unambiguously enjoins Lynx from "[m]aking any reference to . . . 'Lynx-Products MRI,' . . . or otherwise offering or advertising for resale any Customizations on any website owned or controlled by Lynx . . ." Lynx's Opposition appears to argue that because the words "Lynx-Products MRI," do not appear on Lynx's website, Lynx has not violated paragraph 2(k). Oppn. at 5. That argument is frivolous, at best. The recitals of the Order define the "Lynx-Products MRI," as the products listed in Exhibit A to the Order.[2] Thus, the Order clearly and unambiguously prohibits Lynx from "*[m]aking any reference*" to the products set forth in Exhibit A to the Order.

The page hand-numbered "22" of Lynx's website (Doc. 40-5, Exh. C to 2/5/13 Yanchar Decl.) clearly and convincingly demonstrates that Lynx's website continues to "reference" (*i.e.*, by *listing*) *all* 16 of the products set forth in Exhibit A to the Order. *See* Doc. 40-5, at p. 22. Merely changing the heading at the top of the page to "Customize" cannot shield Lynx from culpability. *Compare id*. to Exhibit A of Order. The Order is clear that Lynx was enjoined from making any reference to "Lynx-Products MRI," which the preamble of the Order expressly identifies as the software products listed in Exhibit A thereto, and defines as "Customizations."

---

[2] The recitals read, *inter alia*: "WHEREFORE, the software products included in the 'MRI Report Library' and 'Lynx-Products MRI' listed on Exhibit A hereto, and the Multi-Report Tool described in Exhibit B hereto are Customizations of the MRI Software created by Lynx or persons acting on Lynx's behalf."

Lynx's continued reference to those products on its website constitutes clear and convincing evidence Lynx is violating the Order. Lynx's defense -- that the Order applies only to selected phrases, and *not* the software expressly identified therein -- can scarcely be taken seriously.

Lynx's further defense -- that Lynx "does not advertise or offer [the Customizations] for resale. Rather, Lynx merely identifies those products as examples of the work Lynx has performed for clients in the past" (Oppn. at 5) -- mischaracterizes both the Order and Lynx's website. First, "making any reference . . . " in and of itself, is a violation of paragraph 2(k). However, *in addition* to "making any reference," the evidence clearly shows Lynx is also "offering and advertising for resale." The word "offer" is in the text introducing the products set forth in Exhibit A to the Order. The lead-in text reads:

> The Lynx team has been developing customizations for MRI users for over a decade. To better serve our clients we now *also offer* SSRS and SharePoint development for customization requests. Below are some of the customizations that we have developed for MRI Users:

Doc. 40-5 at p. 22. (emphasis added). In addition, as shown on the left hand side of page 22 of Lynx's website, the "Customize" link, which brings up the prohibited list of products, is under the heading "Lynx Products." *Id*. Related pages of Lynx's website further belie Lynx's argument. For example, on page 21, which describes "Lynx Products" generally, Lynx advertises: "Lynx Systems has developed a family of Lynx modules which fully integrate to the core property managing accounting software." Moreover, when a website visitor clicks on any of the listed products, a description, pitching the product to the visitor, pops up. *See* Exhibit 2 (additional pages of www.lynxsystemsinc.com, printed 3/4/13). Anyone visiting Lynx's website would clearly understand that Lynx is continuing to offer and advertise for resale the software products comprising the "Lynx-Products MRI," as well as other Customizations. Thus, there can be no question that Lynx has violated paragraph 2(k).

In short, instead of obeying paragraph 2(k), Lynx merely changed a heading on one page of its website. Clear and convincing evidence shows that, since the date of the Order, Lynx has continued to make reference to and describe the "Lynx-Products MRI" and has continued to

offer and advertise for resale Customizations, including those products, on its website.  For its blatant disregard of paragraph 2(k) of the Order, MRI respectfully submits Lynx should be held in contempt.

### III. MRI Has Repeatedly Identified the Master Agreement Signatories to Lynx.

Attempting to diffuse the clear and convincing evidence that Lynx is continuing to provide services to Master Agreement Signatories in violation of the Order, Lynx's Opposition repeatedly asserts that it has not received notice that any of MRI's clients are "Master Agreement Signatories," as defined in paragraph 3(b) of the Order.  For example, Lynx argues:

> MRI has not put Lynx on "written notice" of who those alleged signatories are as required by Section 3(b) of the Stipulated Injunction.  Rather MRI merely has supplied lists of customers to Lynx's counsel, but not Lynx itself, which it has marked as "Attorneys' Eyes Only." . . . Lynx itself therefore has no way of knowing whether a particular customer is a Master agreement Signatory."

(Oppn. at 7.)  The record shows this is *absolutely false.*  On October 22, 2012, MRI provided Mr. McLandrich a list marked "CONFIDENTIAL," (*not* Attorneys Eyes Only) that expressly notified Lynx which of its 127 Lynx-MRI Customers are Master Agreement Signatories.  Sealed Yanchar Decl, ¶ 9.  On February 18, MRI provided Mr. McLandrich with a supplemental list of 16 additional Master Agreement Signatories, which was also marked CONFIDENTIAL (*not* Attorneys Eyes Only).  *Id*., ¶ 19.  Because these lists were not marked Attorneys' Eyes Only, Mr. McLandrich was responsible for sending them to his client, and MRI certainly, and *reasonably*, assumed he would.  *Id*., ¶ 6, 10.

Not only is Lynx's "no notice" defense false, it appears to have been contrived as a last ditch attempt to avoid contempt.  Nine days after the Order issued, counsel for MRI wrote to Mr. McLandrich to confirm in writing that "Attorneys' Eyes Only" lists of Master Agreement Signatories provided to *him*, would constitute notice to *Lynx* pursuant to paragraph 3(b) of the Order.  *Id*., ¶ 11.  In addition to the original list of Master Agreement Signatories provided to Lynx in July, MRI sent Mr. McLandrich additional "Attorneys' Eyes Only" lists of Master Agreement Signatories, and writings confirming that they constituted notice to Lynx, on

November 20 and January 15. *Id*., ¶¶ 11, 14. *Never once* did Mr. McLandrich ever assert that those lists did *not* constitute notice to Lynx of the Master Agreement Signatories. *Id.,* ¶¶ 3-22. To the contrary, Mr. McLandrich and counsel for MRI discussed the specific mechanics of using those lists to ensure Lynx remained informed of the Master Agreement Signatories. *Id*., ¶ 13. In addition, Lynx relied on the lists of Master Agreement Signatories in calculating its December 19, 2012 settlement offer. *Id*., ¶ 16. Lynx, and its counsel, have an affirmative duty to take "all reasonable steps within their power to comply" with the Order. *Glover v. Johnson,* 934 F.2d at 70. The filing of Lynx's Opposition Brief is the *first time* Lynx ever asserted it lacked notice of the Master Agreement Signatories. *Id*., ¶ 22. The record shows that either that assertion is simply false, or that Lynx has been shielded so that it remains willfully ignorant of information provided to its counsel. In either event, a finding of contempt is warranted.[3]

In sum, based on all the lists provided by MRI, Lynx has received notice that 68 of its 127 MRI clients are Master Agreement Signatories. Even accepting Lynx's newly contrived position that the Attorneys' Eyes Only lists of July 20, November 20 and January 15 did not provide notice to Lynx, the lists provided on October 22 and February 18 (only marked "Confidential") gave notice that 63 of Lynx's 127 clients are Master Agreement Signatories. Thus, there is absolutely no merit to Lynx's attempt to avoid contempt by arguing it lacked notice of the Master Agreement Signatories.

## IV. Lynx Is Flouting the Order By Telling Master Agreement Signatories Lynx Can Provide Prohibited Services to Them With MRI's Authorization.

As set out in MRI's Opening Brief at pages 5-6 and supporting declaration, during negotiations of the Order, Lynx requested that an exception be added that would allow Lynx to perform the recited acts of paragraphs 2(c), (d) and (e) if Lynx fist obtained MRI's written

---

[3] Lynx's professed confusion as to the number of "installations" of MRI Software versus the number of MRI clients is a red herring. (Oppn. at 7.) Unlike the term "Master Agreement Signatory," which the Order defines, the term "installations" does not appear in the Order, and is therefore irrelevant to this Motion. Moreover, as Lynx should know from its often touted "decades of experience" in the real estate software market, "installations" is a far broader term, that for MRI represents every separate installation of the MRI Software through time. Because MRI was founded in the 1970s, this is a substantially larger number than MRI's existing customer base. There is thus no "disconnect in MRI's math." *Id.*

authorization to do so, but that exception was expressly rejected. Lynx's Opposition argues that MRI's "lengthy narrative of the parties negotiations and other facts . . . ultimately have no relevance . . .." Oppn., p. 6. Deliberately choosing to ignore the facts, Lynx argues:

> Lynx finds it hard to image that MRI actually is taking the position that the [Order] prohibits Lynx from providing those services even if MRI were to grant permission. It further is hard to imagine that MRI is actually asking this Court to, or suggesting that this Court would, enforce the [Order] against Lynx for providing such services if authorized by MRI by arguing that the [Order] precludes it from providing them under any and every circumstance, notwithstanding MRI's consent.

These arguments show Lynx simply *refuses to accept* the authority of this Court's Orders *as written.* Lynx ignores that, as written (and negotiated and agreed upon and *entered*), the Order *does* prohibit Lynx from providing enumerated services on behalf of Master Agreement Signatories under any and every circumstance, *notwithstanding MRI's consent.* Lynx also ignores that it asked for MRI's consent before the Order was entered, and MRI unequivocally said "no." Doc. 40-2, 2/5/13 Yanchar Decl. at ¶¶ 2-6. On January 25, Lynx told Master Agreement Signatories that Lynx could continue to have "**direct** access to your MRI system" and could provide services for them, such as "creat[ing] new customizations," and "using your copy of the MRI Toolkit," so long as Lynx has "written approval from MRI." Doc. 40-13 (second paragraph) (emphasis in original); *see also* Doc. 43, 2/5/13 Post Decl. ¶¶ 4-9; Sealed Yanchar Decl. at ¶¶ 23-32. When Lynx gives this message to Master Agreement Signatories, Lynx is lying about the terms of the Order, disrespecting MRI's copyrights, and interfering with MRI's customer relationships. Doc. 43, 2/5/13 Post Decl., ¶¶ 9-14. In short, Lynx is continuing to engage in *exactly* the sort of mischief the Order was intended to prevent. *Id; see also U.S. v. Christie Industries, Inc.*, 465 F.2d 1002, 1006 -1007 (3d Cir.1972) (finding defendant in contempt and stating injunction must be read "in the light of the circumstances surrounding its entry . . . and the mischief that the injunction seeks to prevent").[4]

---

[4] In *Christie*, the court found the defendant in contempt of an order enjoining the marketing and sale of fireworks "kits" comprised of five component parts where the defendant continued to sell the component parts of the kits separately, did not market them as a "kit," and substituted one or more of the component parts listed in the

Particularly in view of the parties' negotiations (the history of which is undisputed), Lynx's denial that the Order unequivocally, and without exception, enjoins it from providing enumerated services to Master Agreement Signatories and its attendant misconduct merit a finding of contempt.[5]

V. **The Undisputed Evidence Clearly Shows Lynx Has Violated Paragraph 2(c) of the Order By Attempting to Access and Accessing Instances of the MRI Software Residing on Computers Controlled by Master Agreement Signatories.**

Again ignoring the plain language of the Order, Lynx argues that, to prove a violation of paragraph 2(c), MRI must show Lynx *actually* accessed the MRI Software, and that the services Lynx provided during the access were prohibited. Oppn. at p. 10. In truth, paragraph 2(c) is not nearly so narrow. Lynx violates paragraph 2(c) by accessing -- *or attempting to access* -- any instance of the MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory, *regardless of what Lynx did while having such access.* The evidence clearly and convincingly shows numerous occasions on which Lynx has attempted such access since the date of the Order.

First, Lynx's January 25 communication, which encouraged Master Agreement Signatories to obtain MRI's permission to allow Lynx "**direct** access to your MRI system," itself constitutes an attempt by Lynx to access MRI Software installed on the Computers of Master Agreement Signatories. Doc. 40-13, second and sixth paragraphs. In addition, there is clear and convincing evidence that, in late November through late January, MRI received numerous emails from clients seeking permission for Lynx to access their MRI Software. Sealed Yanchar Decl., ¶¶ 23-32. The emails are from *six different MRI clients,* all but one of whom were identified to Lynx as Master Agreement Signatories on both July 20 (in an "Attorneys' Eyes Only" list) and

---

injunction order. Observing that the purpose of the injunction was to prevent the danger of providing consumers with an easy means of building their own fireworks, the court found the defendants in contempt for violating the purpose of the injunction, of which the defendants were well aware. *Id.*

[5] Lynx's attempt to deflect attention from its own misconduct by casting aspersions at MRI as being "anticompetitive" should not be taken seriously. As admitted in the recitals of the Order, and in Lynx's interrogatory responses (Exh. B to Sealed Yanchar Decl.), Lynx has extensively used the MRI Software without permission, and greatly profited from doing so. Insisting that Lynx now respect MRI's copyrights and client agreements, obey the law, and (of foremost importance to the present Motion) *obey the Order,* is not anticompetitive.

on October 22 (in a "Confidential" list). *Id.*[6] The emails reference requests for Lynx to, for example, assist the client "locally" (*i.e.*, on the client's Computers), *see* MRI-LYNX00209, and use the MRI Toolkit (part of the MRI Software). MRI-LYNX00210-212. According to Lynx, all MRI Software on Lynx's Computers was destroyed. (Doc. 37). It is therefore clear that when these emails reference Lynx using *any* MRI Software (*e.g.,* the ToolKit,), it can *only* be MRI Software installed on Master Agreement Signatories' Computers. Based on the January 25 Lynx communication and the foregoing emails, there can be no question that Lynx has repeatedly violated paragraph 2(c)'s prohibition on "*attempting to access* . . . any instance of the MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory." (Emphasis added.)

In addition, by actively soliciting to provide Webex sessions to Master Agreement Signatories, Lynx has violated paragraph 2(c)'s prohibition on "*attempting to access* . . . any instance of the MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory." Lynx's January 25 communication to the market expressly solicited clients who "signed the new SMA agreement after September 1, 2010 [i.e., Master Agreement Signatories] but have not received approval from MRI as yet" to allow Lynx to perform training and support services "through on-line Webex sessions." Lynx's Opposition *expressly admits* "Webex allows *access to* and viewing of remote computers," and that "a user could also allow Lynx to exercise control over that computer via Webex." (Oppn. at 10, emphasis added.) Lynx offers no rebuttal to MRI's evidence that Webex sessions allow Lynx to work within the MRI Software just as if the software was on Lynx's own computer. *See* Doc. 40-9, Ghilani Decl. at ¶¶ 10-16. Indeed, Exhibit A to Lynx's Opposition (Doc. 46-1), a page advertising Webex software, bolsters MRI's evidence that Webex sessions allow access. *Id; see also* Doc. 40-8 (Exh. F to

---

[6] The client identified on page MRI-LYNX 000203-204 was identified to Lynx as a Master Agreement Signatory on November 20. (Exh. A, Sealed Yanchar Decl., ¶25). As such, MRI concedes that the 30 day safe-harbor provision of paragraph 5 of the Order would insulate Lynx from liability flowing from that communication standing in isolation. Even so, the forgoing pages constitute strong evidence of Lynx's *modus operandi:* attempting to access MRI Software installed on Master Agreement Signatories' Computers by encouraging such clients to contact MRI to obtain permission for Lynx to do so.

2/5/13 Yanchar Decl.). Thus, there can be no question that Lynx's January 25 communication, wherein Lynx solicits Master Agreement Signatories with an offer to provide Webex sessions, constitutes an "attempt[] to access" MRI Software installed on Computers of Master Agreement Signatories.

Lynx's argument -- that viewing the screen of a computer does not actually constitute an infringement of copyright -- talks past the issue presented for resolution and ignores the language of paragraph 2(c) of the Order. It is well settled that Lynx may not defeat a finding of contempt by challenging the merits of the Order.[7] Rather, the standard for contempt is whether Lynx violated the terms of the Order, *as written,* taking into account the circumstances surrounding its entry and the mischief that the injunction seeks to prevent. *Christie*, 465 F.2d at 1007. In directing Lynx to destroy the MRI Software on its Computers, and prohibiting Lynx from accessing or attempting to access the MRI Software on Master Agreement Signatories' Computers, the purpose of the Order is clear: remove the opportunity for Lynx to freely benefit from MRI's Software. Webex sessions are simply a different conduit for Lynx to continue to access -- and thereby freely enjoy all the benefits of -- the MRI Software. Clearly, therefore, Lynx's conduct violates both the letter *and* spirit of the Order. *Id.; see also John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942) (defendant in contempt of order requiring the display of a notice of differentiation alongside any use of the name "Stetson" where the defendant's advertisements displayed the requisite notice in miniscule-sized font and the "Stetson" name in large, bold letters).

Finally, it should be noted that not only has Lynx "attempt[ed] to access . . " in violation of paragraph 2(c), there is clear and convincing evidence Lynx has *actually accessed,* through at least one such Webex session. Lynx's counsel admitted such a session occurred in his January 29 voicemail. Doc. 40-6. The direct evidence as to whether this Webex session was conducted

---

[7] "A party who is alleged to be in contempt of a court order may not challenge the substantive merits of the order within contempt proceedings." *See Marshak v. Treadwell,* 595 F.3d 478, 485-486 (3d Cir. 2009); *Chicago Truck Drivers,* 207 F.3d at 504; *Belfor USA Group, Inc. v. Insurance Reconstruction, LLC*, 755 F.Supp.2d 812, 816 (E.D. Mich. 2010) (finding defendant in contempt of consent judgment and rejecting defendant's argument that its conduct did not actually amount to infringement as "talk[ing] past the issue presented for resolution.")

on behalf of a Master Agreement Signatory lies exclusively with Lynx; however, tellingly, Lynx's Opposition was not supported by any declaration denying that that session was conducted on behalf of a Master Agreement Signatory. Moreover, because the Order does not prohibit Lynx from accessing MRI Software installed on Computers of clients who are *not* Master Agreement Signatories, there would be no reason for Lynx to use Webex (as opposed to the traditional conduit of VPN) to access MRI Software installed on the Computer of a non- Master Agreement Signatory.[8] As such, the circumstantial evidence that Lynx has *actually accessed* MRI Software installed on the Computer of a Master Agreement Signatory, is clear and compelling. *See FTC v. Asia Pacific Telecom, Inc.,* 788 F.Supp.2d 779, 788 (N.D. Ill. 2011) (holding defendant in contempt, noting that "although the record lacks direct evidence . . the circumstantial evidence is damning.").

In sum, there is clear and convincing evidence that Lynx has *attempted to access* MRI Software installed on the Computers of Master Agreement Signatories in violation of paragraph 2(c), and has *actually* accessed such software in *further* violation of paragraph 2(c).

**VI.** **To Provide the Additional Services Advertised by Lynx on January 25, Lynx Must Access the MRI Software Installed on the Computers of Master Agreement Signatories in Violation of Paragraph 2(c).**

Lynx's January 25 communication expressly solicited clients who "signed the new SMA agreement after September 1, 2010" [*i.e*., Master Agreement Signatories] but have not received approval from MRI as yet" to allow Lynx to "build new reports and customizations using third party tools such as Microsoft SQL Server Reporting Services ("SSRS") and Microsoft SharePoint . . [,] build completely new applications and sophisticated workflow system in SharePoint and link them into your MRI database, . . . and provide full data conversions into and out of the MRI database." Lynx does not dispute it is currently offering such services.

---

[8] In rebuttal to Lynx's attempts to cast MRI's conduct as "anticompetitive," it should be noted that MRI has been assiduous in not overstating its rights and not stopping Lynx from servicing its MRI clients who remain in contracts that allow third parties to access to their instances of the MRI Software.

MRI submitted evidence that Lynx *cannot* provide the foregoing services without accessing the database schema of the MRI Software.  Doc. 40-9, Ghilani Decl, ¶¶ 17-21.  As explained in the Declaration of Patrick Ghilani, to move the client's data in and out of the database, as Lynx advertises, the data must be in the exact format in which MRI Software stores such data.  Doc. 40-9, Ghilani Decl., ¶ 21.  Thus, access to the MRI database schema is needed to successfully complete these tasks Lynx advertises.  *Id*.  Lynx's Opposition utterly fails to rebut the foregoing evidence.  Lynx offered no evidence *whatsoever* that it is extracting client data in its raw form (without the database schema) and no explanation whatsoever for how it could possibly link customizations in the MRI Software, or "provide data conversations *into and out of* the MRI database," as it advertises, without accessing the database schema of the MRI Software.  Thus, there is clear and undisputed evidence Lynx has violated paragraph 2(c) by attempting to access the database schema of the MRI Software (which paragraph 3(a) defines as part of the MRI Software) on the Computers of Master Agreement Signatories.

Instead of disputing the facts, Lynx devotes 4 pages of its Opposition (pages 11-14) to arguing that accessing client data is not a violation of copyright law.  In so arguing, Lynx again talks past the issue presented for resolution, and ignores the language of paragraph 2(c).  Moreover, Lynx's reliance on *Assessment Technologies v. Wiredata,* 350 F.3d 640 (7th Cir. 2003) is misplaced.  In *Wiredata*, it was undisputed that the defendant was pulling *unstructured* data out of the plaintiff's software, and that the defendant was not using the data to compete with the plaintiff.  Thus, the court concluded the defendant's use fell within the "fair use" exception of the Copyright Act.  *Id*. at 644-45.  The court expressly acknowledged that the plaintiff held a valid copyright in the format of its data, and that, *if* the defendant had used the data in the form in which it was organized in plaintiff's database, it *would* infringe plaintiff's copyright.  *Id*. at 643.  Thus, *Wiredata* fully supports the position that MRI's copyrights protect the database schema of the MRI Software, and that Lynx's use of the database schema infringes MRI's copyrights.

Moreover, at least two other courts, including this Court, have refused to follow *Wiredata*, and found merit in the plaintiff's copyright infringement claim, where the defendant

extracted data from plaintiff's software as a first step in creating software that competed with the plaintiff. *Snap-On Bus. Solns., Inc. v. O'Neil & Assoc., Inc.*, 708 F.Supp.2d 669, 686 (N.D. Ohio 2010) (finding plaintiff's software link structure protectable, and stating: "whatever copying O'Neil did, it did as a first step in creating a new database for Snap-on's client. These facts call into question *Wiredata's* application here"); *see also DSMC, Inc. v. Convera Corp.*, 479 F.Supp.2d 68, 83 (D.D.C. 2007) (refusing to follow *Wiredata* where defendant not only extracted raw data, but also created a product with similar features to plaintiff's software).

In sum, there is no basis on which to reasonably conclude that Lynx is only extracting unstructured (raw) data as was the case in *Wiredata*. Rather, the undisputed evidence shows Lynx *must* access the MRI database schema to provide the services Lynx currently offers to Master Agreement Signatories. Moreover, the parties expressly agreed (and the Court ordered) that database schema is part of the "MRI Software." Order, ¶ 3(a). Thus, there is clear and convincing evidence that, by offering the above quoted services to Master Agreement Signatories, Lynx has, at a minimum, "attempt[ed] to access . . . MRI Software residing on any Computer owned or controlled by any Master Agreement Signatory," in violation of paragraph 2(c) of the Order.

### VII. Lynx Is Violating Paragraphs 2(b) and 2(d) of the Order By Creating and Distributing Customizations.

Paragraph 2(b) prohibits "copying or distributing any copy of . . . any of the Customizations described in Exhibit A" to the Order. As discussed *supra* in Section II, clear and convincing evidence shows Lynx has continued to reference and offer and advertise for resale the Customization listed in Exhibit A to the Order.

Paragraph 2(d) prohibits "creating, developing, distributing or implementing any Customization on behalf of any Master Agreement Signatory." There is undisputed evidence that on December 18, January 10 and January 25, Lynx actively solicited Master Agreement Signatories to allow Lynx to create and distribute Customizations. Doc. 40-11, 40-12 and 40-13. In addition, the February 4, 2012 Post Declaration described numerous communications from

Master Agreement Signatories seeking permission for Lynx to provide such services. Doc. 43, 2/5/12 Post Decl. at ¶¶ 4-9. MRI produced these emails to Lynx, and Mr. McLandrich reviewed them, two weeks before Lynx filed its Opposition. Sealed Yanchar Decl., ¶ 23. These emails are described in greater detail, and attached to the Sealed Declaration of Georgia Yanchar, submitted herewith. Sealed Yanchar Decl., ¶¶ 23-31. The emails identify, *by name*, specific Master Agreement Signatories, and describe *specific services* that Lynx has attempted to provide in late November through late January. These services include developing Customizations (¶ 24, 26, 27, 28) and distributing Customizations (¶ 30-32) in violation of at least paragraphs 2(c) and 2(d) of the Order. These Master Agreement Signatories were identified to Lynx in both July and October 2012. Lynx's January 25 email, together with these emails, show that Lynx is actively encouraging Master Agreement Signatories to contact MRI to allow Lynx to perform the prohibited services.

Lynx's apparent argument -- that it can *advertise* Customizations and prohibited services, so long as it doesn't actually *provide* such Customizations services -- reflects a total lack of respect for this Court and its Orders. Moreover, if Lynx has been complying with the Order, and not actually selling the Customizations or providing the prohibited services, as it advertises and offers them, a representative of Lynx could have submitted a declaration swearing to that fact. Lynx did not. Nor has Lynx certified its compliance. Nor has it provided much of the discovery MRI has requested. *See* Doc. 45 (MRI's Motion to Compel Discovery). Lynx knows it is the best and perhaps only source of the direct evidence of its violations of the Order, yet Lynx has allowed *all of the evidence submitted with MRI's Motion to remain totally undisputed.*

Taken all together, the evidence clearly and convincingly shows that Lynx has taken numerous affirmative acts to continue to provide Customizations and services in violation of paragraphs 2(b) and 2(d) of the Order. Thus, the circumstantial evidence of Lynx's violation of these provisions of the Order is compelling. To the extent the Court finds any remaining factual issue with these paragraphs, MRI respectfully requests that the Court conduct an evidentiary hearing, or order Lynx to allow expedited discovery as to its compliance.

## VIII. Conclusion

Lynx has indisputably failed to take "all reasonable steps within [its] power to comply" with the Order.  *Glover*, 934 F.2d 707.  Rather, Lynx's Opposition reflects an outright *refusal* to acknowledge, or respect, the clear terms of the Order as written.  Clear and convincing evidence shows Lynx has violated the Order in numerous respects, including by 1) failing to certify to its compliance as required by paragraph 7;  2) making any reference to, or advertising or offering for resale "Lynx-Products MRI," as prohibited by paragraph 2(k); 3) attempting to access or accessing MRI Software (including the database schema of the MRI Software) installed on Computers of Master Agreement Signatories, as prohibited by paragraph 2(c); and 4) creating and distributing Customizations, as prohibited by paragraphs 2(b) and 2(d).  In addition, by falsely telling customers it can continue to provide prohibited services, and misleading the market to believe that MRI and Lynx have a mere "mutual agreement," Lynx has violated paragraphs 2(l) and 2(m) of the Order.  Opening Brief, at 11-12.  Accordingly, MRI respectfully requests that the Court enter an order requiring Lynx to appear and show cause why it should not be held in contempt, and failing such a showing, to purge its contempt as set forth in MRI's Opening Brief.

In the alternative, while MRI submits there is ample undisputed evidence before the Court to support a finding of contempt, to the extent the Court determines additional development of the record is needed, MRI respectfully requests that a ruling on this Motion be deferred pending an evidentiary hearing.

Respectfully submitted,
DATED:  March 4, 2013
Signature /s/ Georgia Yanchar
Daniel McMullen (0034380)
Georgia Yanchar (0071458)
CALFEE, HALTER & GRISWOLD, LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH  44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
dmcmullen@calfee.com

gyanchar@calfee.com

Counsel for MRI Software, LLC

## CERTIFICATE OF SERVICE

I, Georgia Yanchar, hereby certify that a true and correct copy of the foregoing *Reply Memorandum in Support of Plaintiff's Motion to Show Cause Why Lynx Should Not Be Held In Contempt* was filed electronically on March 4, 2013. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Georgia Yanchar
Georgia Yanchar
One of the Attorneys for Plaintiff