# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MRI SOFTWARE, LLC
28925 Fountain Parkway
Solon, OH  44139

    Plaintiff,

          v.

LYNX SYSTEMS, INC.
932 The East Mall, 3rd Floor
Toronto, ON  M9B 6J9

    and

DONALD ROBINSON
77 Ravensbourne Crescent
Toronto, ON  M9A 2B1

    Defendants.

:
:  Case No. 1:12-cv-01082-CAB
:
:
:  Judge Christopher A. Boyko
:
:  **[PROPOSED] FIRST AMENDED**
:  **COMPLAINT**
:
:
:
:
:
:
:
:
:
:
:
:
:
:

       Plaintiff MRI Software, LLC ("MRI" or "Plaintiff") through its undersigned counsel, for

its First Amended Complaint against Defendant Lynx Systems, Inc. ("Lynx" ) and Donald

Robinson ("Robinson") (collectively, "Defendants"), states as follows:

       1.     This is an action for copyright infringement pursuant to 17 U.S.C. § 501 *et seq.*

(Count I); violation of the Computer Fraud and Abuse Act pursuant to 18 U.S.C. § 1030 (Count

II); violation of the Electronic Communications Privacy Act pursuant to 18 U.S.C. § 2701

(Count III); violation of the Digital Millennium Copyright Act (DMCA) pursuant to 17 U.S.C. §

1201 *et seq.* (Count IV); violation of the Copyright Act of Canada pursuant to the Berne

Convention (Count V); misappropriation of confidential business information and/or trade secret

pursuant to O.R.C. § 1333.61 *et seq.* (Count VI); trespass pursuant to Ohio law (Count VII);

breach of contract (Count VIII); inducement of breach of contract (Count IX); interference with

existing and prospective economic advantage pursuant to Ohio law (Count X); trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1114 (Count XI); false designation of origin pursuant to the Lanham Act, 15 U.S.C. § 1125(A) (Count XII); commercial disparagement pursuant to Ohio law (Count XIII); false advertising pursuant to 15 U.S.C. § 1125(B) (Count XIV); deceptive trade practices pursuant to O.R.C. § 4165 (Count XV); unjust enrichment/restitution pursuant to Ohio law (Count XVI); and an accounting under Ohio law (Count XVII).

## I.    INTRODUCTION

2.      This case is about Defendants' illegal business practices.

3.      Lynx holds itself out as a support provider to companies that license MRI Software.  Central to Lynx's business model is the infringement of MRI's software copyrights. In the course of its business, Lynx illegally accesses, copies and creates derivative works of the MRI Software, which it uses in illegal ways to offer low-cost support and maintenance for MRI Software, and to induce MRI Software users not to renew their support and maintenance agreements with MRI, in favor of Lynx.

4.      That is not all.  Lynx also has engaged in a pervasive and ever increasing pattern of holding itself out as being a "partner" or "affiliate" of MRI, while at the same time disparaging MRI's support services and offerings.  In addition, Lynx falsely advertises that it can offer support and maintenance services for the MRI Software comparable to the services offered by MRI, even though Lynx has no rights in the MRI Software.  But for Lynx's infringement and misappropriation of MRI's valuable assets, Lynx could not provide the "complete" software support services it advertises, and certainly could not do so at the rates it offers.

5.     Defendant Robinson is, and always has been, the President of Lynx.  Robinson oversees all departments of Lynx, and all employees ultimately report to him.  Robinson is the only officer of Lynx.

6.     MRI has invested millions of dollars in the development of the MRI Software, and in delivery of its software support and maintenance services.  Rather than invest the time and resources required to develop its own business, Defendants stole from MRI to compete against MRI for the business of the MRI Software users.  MRI brings this lawsuit to end Defendants' unlawful business practices and redress the harm that Defendants have caused.

## II.     THE PARTIES

7.     Plaintiff MRI is a Delaware corporation with its principal place of business at 20800 Harvard Road, Highland Hills, Ohio 44122.

8.     Defendant Lynx Systems, Inc. is a Canadian corporation with its principal place of business at 932 The East Mall, 3rd Floor, Toronto, Ontario, Canada.

9.     Defendant, Robinson, is an individual residing at 77 Ravensbourne Crescent, Toronto, Ontario, M9A, 2B1.

10.    Defendant, Robinson, has the ability to supervise and exercise control over Defendant, Lynx, and is responsible for its actions.

11.    Defendant, Robinson, has a direct financial interest in the activities of Defendant Lynx.

12.    Upon information and belief, each of the named Defendants is connected with the matters alleged herein and is liable to MRI.

13.    Upon information and belief, each Defendant was the agent, servant, employee, partner and/or joint venturer of each of the other Defendants; the acts of each Defendant were

within the scope of such agency, service, employment, partnership or joint venture; in committing the acts and omissions alleged herein, each Defendant acted with knowledge, permission and/or consent of every other Defendant; and each Defendant aided, abetted, and/or conspired with the other Defendants in the acts and omissions alleged herein.

14.     Upon information and belief, Robinson has been the sole attendee at Lynx's annual meetings.

15.     Upon information and belief, Robinson is the sole determiner of his annual salary.

16.     Upon information and belief, Robinson ratified or otherwise conceded to the knowing *ultra vires* actions of Lynx.

17.     Upon information and belief, Robinson actively participated in the acts of Lynx alleged herein.

18.     Upon information and belief, Robinson caused or materially contributed to the acts of Lynx alleged herein.

19.     Aware of the knowing *ultra vires* actions of Lynx, and ratifying and conceding to Lynx's actions alleged herein, Robinson is not entitled to protections from personal liability afforded by the laws of Corporations.

### III.     JURISDICTION AND VENUE

20.     MRI's causes of action include claims under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*., the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*. , the Lanham Act, 15 U.S.C. § 1051 *et seq.,* the Digital Millennium Copyright Act, 17 U.S.C. § 1201, *et seq.,* and the Electronic Communications Privacy Act, 18 U.S.C. § 2701, *et seq.*   Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338.

21.     This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to MRI's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

22.     Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the dispute occurred in this district, a substantial part of the property that is the subject of the action was and is situated in this district.

23.     Defendants are subject to the personal jurisdiction of this Court and the Court's exercise of such jurisdiction over them comports with due process.

24.     Defendants are subject to general personal jurisdiction in this judicial district because they regularly do business in the State of Ohio and this judicial district and have maintained systematic and continuous contact with Ohio and Ohio residents in this judicial district.  For example, during the relevant time period, numerous customer service representatives of Lynx have lived and worked from their homes in this district, and provided services to customers of Lynx from this district.  Indeed, most, if not all, of these representatives were former employees of MRI, who were hired by Lynx and chosen by Robinson because of their knowledge of the MRI Software and MRI's business.  Robinson has received substantial revenue from services rendered in this state.

25.     In addition, during the relevant time period, Robinson regularly travelled to the Cleveland area to meet with customer service representatives of Lynx and to conduct business in this district.  In fact, upon information and belief, Robinson travelled to this district for the purpose of investigating commercial office space in this district from which to further conduct Defendants' business.

26.     In the alternative, Defendants are subject to the personal jurisdiction of this Court by virtue of the Ohio long-arm statute inasmuch as Defendants, acting directly or through their agents, have caused the events giving rise to the claims asserted herein to occur by: (a) transacting business in Ohio and this judicial district; (b) causing tortious injury in the State of Ohio by an act or omission inside the state; or (c) causing tortious injury to MRI in the State of Ohio by an act or omission outside the state while otherwise engaging in other persistent conduct in the state or deriving substantial revenue from goods used or services rendered in the state.

## IV.     FACTUAL ALLEGATIONS

### A.     MRI Has Continually Operated in the Cleveland Area Since 1971.

27.     MRI's predecessor, Management Reports, Inc., was founded in or around Cleveland, Ohio in 1971. Fred and Sid Goodman founded Management Reports, Inc. with a vision of providing timely, accurate reporting to the real estate management industry. Through the 1970s and 1980s, MRI provided services and, eventually, software to enable more timely and accurate reporting to the real estate management industry.

28.     In the 1990s, Management Reports, Inc. created a software program for managing real estate, which became the company's core product.

29.     In 2004, Management Reports, Inc. was acquired by Intuit Inc. On or around June 30, 2004, Management Reports, Inc. changed its name to "Intuit Real Estate Solutions, Inc.," which also did business under the acronym "IRES" and continued to do business under the name "MRI."

30.     On or around November 30, 2004, Intuit Real Estate Solutions, Inc. (d/b/a/ IRES d/b/a MRI) was dissolved. At the time of dissolution, all of IRES's assets were transferred to Intuit Inc., as sole shareholder of IRES. Thereafter, IRES operated as a division of Intuit.

31.     IRES operated from the same Cleveland area headquarters from which Management Reports, Inc. had previously operated, and the MRI trademark and trade name continued to be used in connection with the sale and marketing of IRES's products and services, including the MRI Software.

32.     Pursuant to an Asset Purchase Agreement dated January 15, 2010, Intuit Inc. sold all of the assets of the IRES division to MRI Acquisition, LLC.  The assets sold to MRI Acquisition, LLC included the contracts and intellectual property rights of Intuit Inc. used in IRES's business.

33.     On or around January 21, 2010, MRI Acquisition LLC changed its name to MRI Software, LLC.

34.     Today, MRI continues to focus exclusively on the real estate property management industry and is the leading developer of real estate property management software. MRI software currently has more than 4,500 installations on five continents and in 41 countries. MRI employs over 400 people worldwide, including software developers, product managers, sales representatives, customer support representatives, professional services personnel, product managers and executives.  Most of MRI's operations, including product development, are run from its Cleveland headquarters.

35.     MRI primarily offers software suites for two markets, residential and commercial real estate.  MRI's Residential Management Solution is designed to meet the needs of owners and managers of apartment communities.  For example, the MRI Residential Management Solution helps property managers manage leasing, schedule lease renewals, manage tenants' deposits, reach maximum occupancy, and ensure customer satisfaction. MRI's Commercial Management Solution is designed to meet the needs of owners and managers of office space and

retail and industrial property managers.  MRI's Commercial Management Solution helps owners and managers maximize profitability by, for example, providing accounting lease administration, billing and reporting functionalities.

36.    In addition to the Residential and Commercial Management Solutions, MRI also offers many complimentary software modules including, for example, modules for managing accounts payable, accounts receivable, general ledger, and purchase orders.  MRI also offers software that allows user to create customizations, such as report design and web design modules, and the "MRI Tool Kit," which is discussed further below.  MRI's software offerings are referred to collectively herein as the "MRI Software."

### B.    MRI's Registrations for its Copyrights and Trademarks.

37.    MRI owns valid and enforceable copyrights in the MRI Software, including the MRI Application Tool Kit, and related documentation, and all upgrades, updates, patches, bug fixes, hot fixes and other modifications thereof, which are creative works of original authorship (collectively the "Copyrighted Works").  At all times relevant hereto, MRI or its predecessor in interest has owned exclusively all rights in and to the Copyrighted Works, specifically including the copyrights therein.

38.    MRI has secured numerous registrations from the U.S. Copyright office covering the Copyrighted Works, specifically including the following:[1]

| Title of Work | Copyright Registration No. |
|---|---|
| MRI Windows | TX0005447523 |
| MRI Software v1.3 | TX  452-908 |
| MRI Software v1.4 | TX 7-453-185 |

---

[1] MRI reserves the right to amend its Complaint in the event it obtains additional copyright registrations for software and materials copied by Lynx beyond the registrations it has already.

| MRI Software v1.05 | TX 7-452-911 |
|---|---|
| MRI Software v2.0 | TX 7-453-168 |
| MRI Software v2.1.2 | TX 7-452-905 |
| MRI Software v2.1.3 | TX 7-452-861 |
| MRI Software v2.1.4 | TX 7-453-173 |
| MRI Software v2.1.5 | TX 7-453-176 |
| MRI Software v3.0 SP3 | TX 7-452-798 |
| MRI Software v3.0 SP4 | TX 7-452-780 |
| MRI Software v3.0 | TX 7-453-181 |
| MRI Software v4.0 SP1 | TX 7-452-809 |
| MRI Software v4.0 SP2 | TX 7-452-789 |
| MRI Software v4.0 SP3 | TX 7-452-727 |
| MRI Software v4.0 SP4 | TX 7-452-677 |
| MRI Software v4.0 | TX 7-452-816 |
| MRI Software v4.0 SP4 | TX 7-452-677 |
| MRI Software v4.2 | TX 7-455-146 |
| MRI Software v4.3 | TX 7-501-582 |
| MRI Software v4.4 | TX-7-630-858 |

39.    The foregoing registration certificates through v.4.3 are attached to MRI's original Complaint as Exhibit 1.[2]

40.    MRI also owns U.S. Registration No. 3048971 (the "'971 Registration") for the mark "MRI."

41.    The '971 registration was issued on January 24, 2006 for "Computer software for use in the field of real estate and property management, namely, computer software for use in accounting and database management, tracking and managing revenue, expenses, profits, losses, depreciation and other financial information, preparing budgets and financial forecasts, tracking

_____

[2] As to TX0005447523, a government record of the copyright registration is included in Exhibit 1.

and updating leases and other contractual matters, tracking and communicating with vendors, managers and tenants, and managing projects, tasks, calendaring, maintenance and work orders." It claims a date of first use at least as early as 1991.

42.    The '971 Registration is valid and subsisting.

43.    A true and correct copy of the registration certificate for the '971 Registration, and the record of the assignment of the '971 Registration to MRI, are attached to MRI's original Complaint as Exhibit 2.

44.    The trademark that is the subject of the '971 Registration is referred to herein as the "MRI Trademark."

45.    The certificate of registration for the MRI Trademark is prima facie evidence of the validity of the MRI Trademark, MRI's ownership of the MRI Trademark, and MRI's exclusive right to use the MRI Trademark in connection with the goods specified in its certificates of registration under 15 U.S.C. §1115(a), as well as constructive notice of MRI's claim of ownership under 15 U.S.C. § 1072.

46.    In addition, MRI's exclusive right to use the MRI Trademark also arises from the continuous and systematic use in commerce of the mark in connection with the MRI Software and MRI's professional services and support services.  The MRI Trademark has been used by MRI or its predecessors in interest in connection with the forgoing goods and services continuously and systematically throughout the United States for at least the last eleven years.

C.    **MRI's Client Agreements.**

47.    The respective rights and obligations between MRI and each of its clients are set forth in the agreements between them.

48.     These agreements typically include a Master Agreement, a Perpetual Software License and Maintenance and Support Schedule, an Order Document and a Professional Services Schedule.  An exemplar of the foregoing documents is attached to MRI's original Complaint as Exhibit 3.[3]

49.     As is typical in the software industry, MRI does not sell ownership rights to its Software or related support products to its customers.  Instead, each MRI client purchases a non-exclusive license allowing a certain number of the client's employees (client users) limited rights to use specific MRI Software solely for the client's own business purposes and solely as enabled by the client's license keys.  *See* Exh. 3, Perpetual Software License and Maintenance and Support Schedule ¶ 2.1 ("License").  License "keys" are technological measures that control the ability of users to download and/or install and/or access the MRI Software.

50.     The Order Document, which is appended to the Master Agreement, sets forth the particular modules of MRI Software licensed by the client.  *See* Exh. 3, Order Document.

51.     MRI's products are offered either as self-hosted or as "Software as a Service" ("SaaS").  Clients who opt for self-hosted are provided a copy of the object code for the MRI Software, which may be hosted and maintained on the client's own computer servers.  Clients who opt for SaaS are not provided a copy of the MRI Software.  Instead, MRI hosts the software and the client is provided a license to access and use the software from MRI's servers.

52.     Pursuant to its client agreements, MRI retains sole and exclusive ownership of all rights, title and interest, including all copyrights, embodied in the MRI Software and services.  *See* Exh. 3, Master Agreement. at ¶ 6.1 ("Limited Rights and Ownership").

---

[3] The client name and other client-specific information in Exhibit 3 has been redacted; however, the terms of the agreement are sensitive business information of MRI.  Accordingly, Exhibit 3 was filed under seal as document number 15.

53.     MRI's agreements with its clients prohibit access to, or reproduction, distribution, or use of, any portion of the MRI Software not expressly licensed to and paid for by the licensee, and any sublicense, disclosure, use, rent or lease of the software to third parties.  *See* e.g., Exh. 3, Master Agreement at ¶ 6.2.

54.     Clients may permit only their employees (or employees of entities controlled by the client) to access or use the MRI Software.  *See* Exh. 3, Master Agreement at ¶ 1.7 ("Client Users").  If a client wishes a third party  to act on its behalf, then the client must obtain prior written consent of MRI, and the third party must enter into contractual terms acceptable to MRI to protect the MRI Software.  *Id.*

55.     For self-hosted clients, the licenses restrict where the customer physically may install the MRI Software, and allow only one or two copies to be made for solely for backup (i.e., disaster recovery) purposes.  *See* Exh. 3, Perpetual Software License and Maintenance and Support Schedule at ¶ 2.3.

56.     Essential to the value of the MRI Software is the fact that it is very customizable, meaning it can be configured to meet the specific needs of each particular client.

57.     Customizations of the MRI Software can be created through the use of several MRI Software modules.  The Application Tool Kit allows modifications to the user interface of the MRI Software when it is running on the Microsoft Windows operating system.  Within the Application Tool Kit are the Database Design module, which allows modifications to the database containing client data, View Design module, which allows modifications to views of client data,  and Menu Design module, which allows modifications of menus within the MRI Software.  Web Design is an additional module that allows modification to the MRI Software when it is running through a web browser.  Additional modules include Report Design, which

allows custom reports to be created, and Workflow Design, which allows custom workflows to be created. The foregoing modules of the MRI Software will be referred to herein collectively as the "MRI Application Tool Kit" or the "MRI Tool Kit."

58.    Accordingly, many clients chose to purchase a license to the MRI Tool Kit so that they can create customizations of the MRI Software for their own business purposes. For clients who chose not to purchase a license to the MRI Tool Kit, the MRI Software is far less customizable.

59.    The ability of the MRI Software to be customized to meet each client's individual needs is one of the most valuable attributes of the MRI Software. Because the MRI Tool Kit makes this customization possible, it is of enormous value to MRI.

60.    MRI's licensing restrictions are important to protect MRI's substantial investment in the development of its software. They also help to make worthwhile MRI's continuous enhancement of its software for the benefit of its clients, which requires continuous investment of time, money and resources by MRI.

**D.    Authorized Maintenance and Support of the MRI Software.**

61.    From time to time, MRI provides new releases, upgrades, updates, patches, hot fixes and other modifications to the MRI Software, which require source code changes (herein "Enhancements"). Enhancements are made available by MRI only to customers who have a current maintenance and support plan and have timely paid all outstanding invoices.

62.    MRI offers a range of support options and pricing packages and allows each client to design a maintenance and support package that best meets its particular business needs.

63.    The client's right to receive maintenance and support is set forth in the client's Perpetual Software License and Maintenance and Support Schedule, and the Order Document,

which are addenda to the client's Master Agreement.  *See* Exh. 3  These documents are tailored

to each client, and set forth the client's right to receive Enhancements to the specific MRI

Software they licensed, as well as support and other services.  *See id.*, Order Document.

64.  Clients who have a current maintenance and support plan and have timely paid all

outstanding invoices can access MRI's client portal, which is currently known as the myMRI

Client Portal, (herein the "Portal), to obtain maintenance and support services for the MRI

Software.

65.  The Portal is a secure web-based service.  To gain access to the information and

services available on the Portal, the client must first pass through a secure log in procedure using

secret credentials (username and password).  These credentials are securely transmitted to the

authorized clients to maintain their secrecy.  These credentials are "Confidential Information"

under the Master Agreement.  *See* Exh. 3, Master Agreement, ¶ 4.1.  MRI takes precautions to

ensure the credentials are maintained as trade secrets and do not become generally known or

ascertainable by unauthorized individuals.

66.  For example, the credentials needed to log into the Portal are provided only to the

"Designated Support Contact" ("DSC") of each client.

67.  Most clients are permitted only one DSC, although some clients are permitted by

MRI to have more than one DSC, in exchange for an added fee.

68.  To become a DSC, and thus receive the credentials necessary to log in to the

Portal, the DSC's name and contact information must be provided in the Order Document, which

is an appendix to the client's Master Agreement with MRI.  *See* Exh. 3, "Order Document," at p.

1.

69.     Normally, only an employee of the client may be designated by the client as a DSC. In very rare instances when a client wishes to designate a non-employee as a DSC, then the non-employee must sign a Third Party Data Access Agreement. The Third Party Data Access Agreement contains terms similar to those contained in the Master Agreement, including terms that strictly limit use of confidential information (such as the MRI Software) and whereby the third party acknowledges that MRI retains all right, title and interest in and to the MRI Software, including any copies or derivative works (e.g., customizations) thereof. Only after the Third Party Data Access Agreement is approved by MRI are credentials provided allowing the third party DSC to log in to the Portal.

70.     After passing through the secure log in procedure, on the Portal, DSCs can obtain information needed to access Enhancements to the MRI Software, submit case reports initiating a service request with MRI, and obtain documentation and training materials for the MRI Software.

71.     After accessing the Portal, DSCs can also access the MRI knowledge base, which is where MRI posts resolutions to known software issues.

72.     Most of the information made available in the Portal is confidential and propriety information of MRI. In particular, all Enhancements to the MRI Software made available through the Portal are valuable trade secrets of MRI, and constitute Copyrighted Works of MRI.

73.     If a client opts not to renew its maintenance and support plan, or becomes delinquent in paying for such maintenance and services, then the client is "turned off" by MRI, so that the client can no longer access the Portal. In these instances, if the client is a self-hosted client (meaning a client has opted to host and maintain the MRI Software on the client's own computer servers) then the client is still authorized to continue to use the MRI Software, because

the rights granted in MRI's agreements include a perpetual license. However, once turned off by MRI, the client is not entitled to receive Enhancements to the MRI Software.

74.    The Portal is the only channel through which MRI provides the information needed to access Enhancements to the MRI Software. In addition, MRI also includes hidden data in the software object code provided to authorized MRI Software users, such as date stamps, as checks to further ensure turned off clients do not obtain Enhancements improperly.

75.    The foregoing protections have been designed and implemented by MRI to ensure that clients who have opted not to purchase or pay for maintenance services from MRI are not provided such software and services for free.

76.    The foregoing protections are important to protect MRI's substantial investment in the development and constant improvement of the MRI Software.

### E.    MRI's Customer Satisfaction Rate.

77.    In addition to offering unlimited access to the Portal, 24 hours a day, 7 days a week, MRI also offers convenient telephonic customer support contact times, multiple support channels including toll-free telephone lines and skill-based routing of cases – meaning each client's unique problem is handled by the most qualified analyst.

78.    In addition, MRI hosts yearly international user conferences. The conferences provide for an opportunity for MRI personnel and clients who have a current maintenance and support plan and have timely paid all outstanding invoices to come together in a rigorous, collaborative environment for three days of intense learning and networking. MRI typically spends around $500,000 to host the conference and expects 200-300 client users to attend each year.

79.     MRI has implemented a system that regularly prompts clients to grade MRI on how it is doing with respect to customer support.  This client-generated data shows that, since MRI was divested from Intuit in January 2010, an increasing number of clients have chosen to provide this feedback, and that MRI's client satisfaction scores have dramatically and steadily increased.

80.     Based on the foregoing substantial data, MRI now delivers approximately 95% customer satisfaction ratings, a very high mark among MRI's peers.

81.     MRI's high customer satisfaction ratings and flexible support options help to differentiate MRI from its competitors and materially affect customers' decisions to chose the MRI Software and services.

**F.      MRI's Revenue Streams.**

82.     The majority of MRI's revenue comes from three basic activities:  a) initial license fees and SaaS fees for the MRI Software; b) fees for professional services including installation services and customizations; and c) fees for maintenance and support services, including services operated through the Portal (including providing Enhancements) and MRI's customer support call center.

83.     As set out below, Defendants have built a business upon unfairly competing with MRI for revenue from MRI's latter two revenue streams.  Defendants do so by infringing and misappropriating MRI's valuable intellectual property, falsely advertising its capabilities, products and services, and disparaging MRI's products and services.

G.     **Lynx's Former Relationship with MRI.**

84.     In August of 2002, Management Reports, Inc. and Lynx entered an agreement

entitled "MRI Product Sub-Licensor and Service Provider Agreement" (the "2002 Agreement"),

attached to MRI's original Complaint as Exhibit 4.

85.     The 2002 Agreement was negotiated and signed by Robinson.  Robinson was the

primary beneficiary of, and point of contact for, the 2002 Agreement.  Robinson directed and

conducted the activities of Lynx, and is liable for all acts and omission of Lynx in connection

with the 2002 Agreement.

86.     Pursuant to the 2002 Agreement, Defendants agreed to market "MRI Products"

(defined in paragraph 1.8 of the 2002 Agreement to include the MRI Software), in exchange for

a portion of the license fee paid to MRI when any Lynx-generated lead entered into an agreement

with MRI.  In addition, Lynx was granted limited rights to provide certain services to certain

clients in the "Territory."

87.     Lynx's "Territory" under the 2002 Agreement was limited to Canada.  No rights

were granted to Lynx outside of Canada, and Lynx had no right to provide any MRI-related

services outside of Canada.

88.     In addition to being territorially limited, Lynx's rights under the 2002 Agreement

with respect to the MRI Products were limited in many other respects.  Indeed, Paragraph 2.1 is

the only paragraph of the 2002 Agreement containing any grant of rights to Lynx.  It provides, in

relevant part, as follows:

> MRI appoints [Lynx] as an Authorized Sub-Licensor for the MRI Product within
> the Territory and grants to [Lynx] a non-exclusive limited license in the Territory
> to (i) distribute, promote, and otherwise market the MRI Product to Clients and
> potential Clients located in the Territory, (ii) sub-license Clients located in the
> Territory to use the MRI Product as authorized by this Agreement and the MRI
> client Software License Agreement except that [Lynx] may not grant to any entity

or individual the right to sub-license the MRI Product, (iii) provide Services to Clients within the Territory relating to the use of the MRI Product; and (iv) use the MRI Product consistent with the terms and condition of this Agreement and to make up to three (3) copies of the MRI Product for internal backup purposes only.

89.     The rights granted to Lynx in paragraph 2.1 were further expressly conditioned upon Lynx's compliance with the requirements of paragraphs 2.2.1 - 2.2.6. Section 2.2.1 of the 2002 Agreement unequivocally stated that MRI retained all rights in the MRI Product:

> [Lynx] acknowledges that the MRI Product and MRI Confidential Information are proprietary to MRI and that MRI retains all right, title, and interest therein and thereto, including without limitation all copyrights, trademarks, trade secrets, and other proprietary rights, and that [Lynx] has no right therein other than as set forth in this Agreement.

90.     In paragraph 2.2.2, Lynx agreed not to alter the MRI Products:

> 2.2.2   [Lynx] agrees not to use, reproduce, sub-license, distribute, or dispose of the MRI Product, alter, create derivative works of, edit, modify, or revise the MRI Product, or reverse engineer, reverse compile, or disassemble the MRI Product, in whole or in part, nor to grant any other person or entity the right to do so, except as (i) expressly permitted by this Agreement, (ii) permitted by using the Customization Tool Kit or (iii) pursuant to applicable law.

91.     In paragraph 2.2.5, Lynx expressly agreed to refrain from providing any MRI-related Services outside of Canada, unless specifically authorized to do so by MRI:

> [Lynx] is not authorized to distribute, promote, market, or sub-license the MRI Product, or provide MRI-related Services, to any Clients or potential Clients outside of the Territory unless specifically authorized to do so under terms and conditions agreed to in advance by MRI. . . SUB-LICENSOR may sell [scheduled] non-MRI related services to MRI Accounts located outside of Canada but must refrain from soliciting or providing training consulting or customization work that directly relates to MRI applications without exception unless with the express written consent with VP of Implementation Services.

92.     Importantly, the 2002 Agreement provided that all of Lynx's obligations under Section 2 of the 2002 Agreement would survive termination. *Id.*, ¶ 2.3.

93.     In addition, Paragraph 9 of the 2002 Agreement prohibited Lynx from soliciting for employment or employing MRI's employees:

Neither MRI nor SUB-LICENSOR shall solicit for employment or employ, an employee of the other party during the term of this Agreement or for a period of one hundred eighty (180) days after termination of this Agreement, without the prior written consent of the other party.

94.     Pursuant to paragraph 10.1, the Initial Term of the 2002 Agreement was one year from the Effective Date, August 1, 2002.  Paragraph 10.1 provided that the Agreement could be extended for up to 5 successive 1 year periods.  Thus, pursuant to its terms, the 2002 Agreement expired or terminated no later than August 1, 2008.

95.     Copies of many modules of the MRI Software, including the MRI Base Application, MRI for Windows and the MRI Software Application Tool Kit (including Menu Design, Report Design, View Design and Web Design) were provided to Lynx in connection with the 2002 Agreement.

96.     Beginning in 2006 and during 2007, Defendants and IRES attempted to negotiate a new agreement to govern their rights and responsibilities.  On December 19, 2006, Robinson attended a meeting with MRI (also then doing business as IRES) in or around Cleveland, Ohio for the purposes of discussing terms for a new agreement.

97.     Defendants and MRI did not agree on terms, and no agreement was entered into between Defendants and MRI (or its predecessor in interest) following the termination of the 2002 Agreement.

98.     Pursuant to paragraph 10.5 of the 2002 Agreement, with very limited exceptions not relevant to this lawsuit, when the 2002 Agreement expired or was terminated, all rights granted to Lynx thereunder automatically and completely reverted to MRI.  *See id.*

99.     Pursuant to paragraph 10.5.2 and 1.12 of the 2002 Agreement, upon expiration or termination of the 2002 Agreement, Lynx was to "immediately cease use of" any "trademark, service marks, trade names and/or other proprietary intellectual property of MRI."

### H.     Defendants' Illegal Business Model.

100.    Following the termination of the 2002 Agreement, Defendants set out on a plan to compete with MRI for the business of MRI Software users, including professional services, such as providing installation services and customizations, and maintenance and support services, including providing Enhancements (e.g., updates) to the MRI Software.  Defendants are only able to provide such services by misappropriating MRI's trade secrets and infringing MRI's Trademarks and Copyrighted Works.

101.    For example, Lynx's website, www.lynxsystemsinc.com, is replete with references to MRI and its software.  Indeed, the title bar for Lynx's website reads:  "Consulting for property management software, MRI Software . . ."  This is shown in Exhibit 5 to MRI's original Complaint, which is a true and correct copy of a print out of the results of a search performed on www.google.com.

102.    The words placed in the title bar of Lynx's website are of particular importance for several reasons:  they are displayed in the search results as the most prominent piece of information available to searchers, they are displayed by each visitor's browser in the border of the viewable screen, and they are used by search engines as the most important piece of information available to help them determine the topic of the webpage.

103.    The placement of "MRI" in the title bar for Lynx's website falsely suggests the existence of an ongoing affiliation or sponsorship between MRI and Lynx.  Upon information and belief, the placement of "MRI" in the title bar of Lynx's website was done to unfairly compete with MRI for revenue derived from support and professional services.

104.    Lynx's website content also falsely associates Lynx with MRI.  Relevant pages of Lynx's website printed in April 2012, www.lynxsystemsinc.com, are attached to MRI's original Complaint as Exhibit 6.  These pages bear a copyright notice dated 2012.

105.    Until on or around July 24, 2012, the home page of the Lynx website contained a link entitled "Affiliates."  Clicking on this link brought up a list of companies, and MRI was at the very top of that list.  *See* Exh. 6.

106.    The listing of MRI as an "affiliate" on Lynx's website falsely suggested the existence of an ongoing affiliation, association or sponsorship between MRI and Lynx and creates a likelihood of confusion among consumers as to the source, origin or sponsorship of Lynx's products and/or services by MRI.

107.    The page of the Lynx's website advertising Lynx's services specifically listed "MRI Services" including "a complete range of support services including hotline support, toolkit customization, report development, technical support, application training, data conversion, project management and implementation support."

108.    The listing of "MRI Services" the Lynx website falsely suggested the existence of an ongoing affiliation, association or sponsorship between MRI and Lynx and creates a likelihood of confusion among consumers as to the source, origin or sponsorship of Defendants' services by MRI.

109. In addition, Defendants' description of "MRI Services" falsely stated or suggested that Lynx had the right to provide the "complete range" of services listed. In fact, Defendants have no right to access or use the MRI Software, including the MRI Tool Kit, or to otherwise provide, for example, "toolkit customization" or "report development" for the MRI Software, as indicated.

110. By providing the services and products offered on the Lynx website in the manner alleged, Defendants violate the continuing obligations under the 2002 Agreement and infringe MRI's Copyrighted Works and the MRI Trademark.

111. Until on or around July 24, 2012, the Lynx website also advertised Lynx's "Products," including the "MRI Report Library" and the "Product List-MRI."

112. The "MRI Report Library" described on Lynx's website consists of approximately 50 reports. Almost all of these reports were generated using the MRI Software. In addition to being created using the MRI Software, many of Lynx's "MRI Reports" are substantially similar to standard reports in the MRI Software. Several are nearly identical to MRI standard reports.

113. The publishing of the MRI Report Library on the Lynx website, and Defendants' advertising and sale of such reports are without the authorization of MRI, and infringe one or more of the Copyrighted Works.

114. The "Product List-MRI" shown on the Lynx website consists of approximately eighteen (18) software modules for use with the MRI Software. Almost all of these products were generated using the MRI Application Tool Kit, including the Web Design module. Each of the foregoing 15 products are custom user interfaces/applications for use with the MRI Software.

115.    For many of the software modules listed under the "Product List-MRI," a link was provided to a "Fact Sheet." Similarly, for each report in the "MRI Report Library," a link was provided to a Description. Many of these Fact Sheets and Descriptions contain screenshots of user interfaces prominently display the MRI Trademark.

116.    In addition, the user interfaces shown in several of the "Fact Sheets" and "Descriptions" were generated using the MRI Software.

117.    The publishing of the Product List-MRI, the publishing of the Fact Sheets on the Lynx website, and the advertising and sale of the listed products are all without the authorization of MRI.

118.    Defendants' publishing of the Product List-MRI, publishing of the Fact Sheets on the Lynx website, and advertising and distribution of the listed products infringes the Copyrighted Works and the MRI Trademark.

119.    The Lynx website also contains customer testimonials that show Lynx is, in fact, misleading customers into thinking that it continues to have an affiliation with MRI. For example, one testimonial on the Lynx website states:

> Thanks to Lynx and MRI (assuming they had some involvement) for resolving this issue for Ted.

*See* Exh. 6.

120.    Lynx's use of the MRI Trademark in connection with its advertisement and promotion of Lynx's own services and products has caused actual confusion among potential purchasers as to the source, origin or sponsorship of Lynx's products and/or services by MRI.

I.    **Lynx's False and Defamatory Targeted Emails.**

121.    Since the 2002 Agreement was terminated, Defendants have sent numerous targeted emails to MRI Software users. Although MRI does not know the full extent of

Defendants' targeted campaign, many of Defendants' emails have been forwarded to MRI by recipient MRI Software users, and are attached hereto as Exhibit 7.

122.    Each of the emails attached as Exhibit 7 is signed by Defendant Robinson.

123.    For example, on November, 17, 2010, Defendants sent an email entitled "Scheduled Meeting - MRI Support Options." *See* Exh. 7.

124.    The November 17, 2010 was replete with false and disparaging statements of fact regarding MRI's services and products. For example, in bold letters, this email stated: **"With a signed long term contract you're stuck – regardless of how unhappy you are with the support!!"** In fact, as of that date, the vast majority of MRI customers were not unhappy with the support provided by MRI, and MRI offered contracts with terms as short as one year.

125.    On December 29, 2010, Defendants sent another targeted email to MRI Software users. This email was entitled "Why MRI Users are not renewing." *See* Exh. 7.

126.    The December 29, 2010 email contains many false or misleading statements couched as "questions," which are intended to disparage MRI's support capabilities, imply that MRI is lacking adequate personnel, that its employees are "disheartened," and hint at other, unspecified "potential warning signs." For example, the December 29, 2010 email falsely stated or implied that MRI's contracts would result in clients losing their perpetual licenses and were "effectively a rental program" when, in fact, the referenced agreements granted a perpetual license to use the MRI Software.

127.    The December 29, 2010 email also stated Defendants could offer "excellent MRI support service without the long term contract and expense."

128.    The December 29, 2010 email concluded with an invitation for MRI Software users to call Defendants to discuss their purported "concerns" – calls in which, upon information

and belief, Defendants made or intended to make further false and disparaging statements about MRI in order to influence MRI customers' purchasing decisions.

129.    On November 10, 2011, Defendants sent another targeted email entitled "Future of Your MRI Software." Therein, Defendants advertised that "[a] number of MRI users are keeping their MRI system but without vendor support. They have decided to forgo higher fees and long term commitments; instead are havehahaveopting [sic] for Lynx Systems' full range of support services including: Premium Level hot line support, training, customizations, MRI Report Library and more. We estimate that with our assistance, most clients could remain with their current MRI software for years, gaining full benefit from their initial software investment."

130.    The November 10, 2011 email further stated that some MRI clients have "required Lynx's support due to support issues as well as for bug fixes or ongoing problems and pain points." This email disparaged MRI's support services, and falsely stated or suggested that MRI's support was inferior, and that Defendants could provide support, including bug fixes, that MRI could not.

131.    The November 10, 2011 email further stated that "Even more clients still rely on Lynx Systems for report development, systems assessments, customizations and add-on application such as EasyMerge." *See id.*

132.    Upon information and belief, all of the foregoing emails were sent to numerous MRI Software users in the United States, Canada, and Bermuda.

133.    All of the foregoing emails are replete with uses of the MRI Trademark, in violation of Defendants' obligation to immediately cease all uses of the MRI Trademarks after the expiration of the 2002 Agreement.

134.     In addition, Defendants use of the MRI Trademark in its advertising infringes MRI's exclusive rights in the MRI Trademarks and MRI's trade name. *See* Exh. 7.

135.     The foregoing emails show a pattern of Defendants regularly soliciting to provide MRI related services outside of Canada without MRI's permission. Defendants' solicitation of customers outside of Canada violated, and continues to violate, the continuing affirmative obligations under Section 2 of the 2002 Agreement not to provide MRI-related services outside of Canada. See Exh. 4 at ¶¶ 2.2.5 and 2.3.

136.     The foregoing emails contain false statements of fact concerning MRI, and characterize MRI's support products, services and contracts in a false and disparaging manner. For example, the foregoing emails falsely and unfavorably characterize MRI's support and maintenance offerings and contractual terms, falsely and unfavorably characterize MRI's customer satisfaction rate, falsely state or suggest that MRI is unresponsive to customer concerns, and falsely state or suggest that MRI treats its clients unfairly.

137.     The false and disparaging statements in the foregoing emails were made by Defendants to intentionally damage the reputation of MRI and its services, and to influence the decisions of MRI Software users as to their choice of providers for service and maintenance of the MRI Software.

138.     The foregoing emails also contain false statements of fact regarding Defendants ability to lawfully provide services offerings comparable MRI's offerings. For example, many of the foregoing emails falsely state that Defendants can offer "Tool Kit" customizations, and provide training, report development, bug fixes and the MRI Report Library. In fact, Defendants' use of the MRI Tool Kit to provide customizations, report development and bug fixes to MRI users who have not purchased a license to the MRI Tool Kit or other necessary

modules of the MRI Software from MRI is without authority and violates MRI's rights in the Copyrighted Works.

139.     Moreover, Defendants have not been approved by MRI as a third party "Client User" pursuant to Paragraph 1.7 of the Master Agreement for any client. *See* Exh. 3. Nor have Defendants ever entered into a Third Party Data Access Agreement with MRI. Thus, even for clients who have purchased a license to the MRI Tool Kit, the use of the Tool Kit by Defendants -- third parties -- is without authority, violates MRI's rights in the Copyrighted Works, and induces MRI's clients to breach their agreements with MRI by exceeding the scope of their licenses.

140.     In sum, Defendants are only able to provide the "complete" services they advertise by infringing MRI's Copyrighted Works, misappropriating MRI's trade secrets, violating federal laws prohibiting unauthorized access to MRI's computers, and interfering with MRI's contractual relationships with its clients.

141.     The false and misleading statements in the foregoing emails regarding Defendants' capabilities and relationship with MRI were made to influence the decisions of MRI Software users as to their choice of providers for service and maintenance of the MRI Software.

**J.     Defendants' Provision of Unauthorized Customizations and Enhancements**

142.     Upon information and belief, Defendants have been engaged in a regular practice of accessing, copying, and distributing MRI's Copyrighted Works and creating derivative works of MRI's Copyrighted Works, in violation of MRI's exclusive rights therein. Defendants have regularly engaged in the foregoing conduct without the requisite authority and/or in excess of any authority purportedly or actually granted to Defendants.

143.    For example, as admitted in Defendants' targeted emails discussed above, and as evidenced on the Lynx website, following the termination of the 2002 Agreement, Defendants have sold customizations to the MRI Software.  These customizations are derivative works of the Copyrighted Works.

144.    All rights granted to Lynx under the 2002 Agreement, including for example, any rights in any customizations of the MRI Software, automatically and completely reverted back to MRI on the effective date of the termination of the 2002 Agreement.  *See* Exh. 4, at ¶ 10.5.

145.    Defendants were granted no right whatsoever to continue to offer any customizations they created during the life of the 2002 Agreement to MRI users after the termination of the 2002 Agreement.

146.    Some of the customizations developed by Lynx during the life of the 2002 Agreement contain the MRI Trademark.  *See* Exh. 6.

147.    Defendants' advertisement for sale and the sale of customizations violates the 2002 Agreement, and infringe MRI's exclusive rights in the Copyrighted Works and the MRI Trademarks.

148.    In addition, on many occasions, Defendants' have received requests to create new customizations from MRI Software users who have not purchased from MRI any license to use the MRI Tool Kit.  On these occasions, Defendants' personnel access one or more copies of the MRI Software necessary to create the customization, such as the MRI Tool Kit, and created the requested customizations.   Thereafter, Defendants provide the customizations to the requesting Lynx customers.

149.    Defendants have never entered into a Third Party Data Access Agreement with MRI, authorizing them to access the Portal or any other protected computers.

150.    Upon information and belief, to perform the foregoing activities, Defendants accessed, copied, and distributed MRI Software to MRI Users, without authorization or in excess of the scope of any authorization actually or purportedly granted to Defendants, and created derivative works of the MRI Software  in excess of Defendants' rights in the Copyrighted Works and in excess of the requesting MRI Software users' rights to use the Copyrighted Works.

151.    On other occasions, Defendants have used a copy of the MRI Application Tool Kit on their own computers to create the customizations, then sent the files containing the customizations to their clients.  Each transmitted file contains portions of the MRI Software needed to generate the customization.

152.    In each instance in which Defendants create a customization to the MRI Software, they create a derivative work of an MRI Copyrighted Work.  When Defendants use the MRI Tool Kit without authorization or provide customizations to an MRI User who has not purchased a license to use the MRI Tool Kit, they violate MRI's exclusive rights in the Copyrighted Works, and  breach the ongoing contractual obligations to MRI under the 2002 Agreement.

153.    In addition, the foregoing conduct actively induces MRI Software users to breach their agreements with MRI by, for example, exceeding the scope of their licenses.  This conduct also tortiously interferes with MRI's existing and prospective relationships with its clients, because Defendants are providing to MRI Software users, for free or at a much reduced cost, access to customizations the client would otherwise have created under a license to the MRI Tool Kit from MRI.

154.    In addition, upon information and belief, Lynx has provided Enhancements, such as upgrades and hot fixes, to the MRI Software to one or more Lynx clients without authorization to do so.

155.    Each Enhancement provided by MRI is a derivative work of one or more preceding versions of the MRI Software, and constitutes a Copyrighted Work.

156.    As mentioned above, MRI makes Enhancements available only to customers who have a current maintenance and support plan and have timely paid all outstanding invoices. The scope of each client's right to access and use Enhancements is defined in the client's maintenance and software supports contracts with MRI. A client's right to access and receive Enhancements to the MRI Software is turned off by MRI when a client opts not to renew its maintenance and support agreement with MRI, or fails to pay.

157.    Upon information and belief, to provide Enhancements to Lynx customers Defendants either directly or working through an agent, have accessed the Portal or one or more other protected computers. Such access is without authorization or in excess of any authorization actually or purportedly granted to Lynx or MRI Clients. Upon information and belief, Defendants or their agents accessed the Portal and/or other protected computers by misappropriating Portal credentials of MRI Users who have valid access rights.

158.    For example, upon information and belief, if Lynx Client A, who opted not to pay for maintenance from MRI, required an update, then Defendants or their agents may have used credentials of Lynx Client B, who had paid for maintenance for MRI, to provide an update to Lynx Client A.

159.    As described above, MRI employs certain technological measures, including license keys and date stamps that effectively control access to the Copyrighted Works, including Enhancements, thereby protecting MRI's exclusive rights therein.

160.     Upon information and belief, to enable the Enhancement to properly install on Client A's computer, Defendants have circumvented MRI's technological measures and/or provided the means to do so.

161.     In each instance in which Defendants provide an Enhancement without authorization, Defendants violate MRI's exclusive rights in the Copyrighted Works and breach ongoing contractual obligations to MRI.   In addition, the foregoing conduct actively induces MRI Software users to breach their agreements with MRI by, for example,  exceeding the scope of their limited licenses.  This conduct also tortiously interferes with MRI's existing and prospective relationships with its clients, because Defendants are providing to MRI Software users, for free or at a much reduced cost, access to Enhancements and/or Services the client would otherwise have obtained from MRI.

162.     The foregoing conduct also violates numerous federal statutes designed to protect information stored on internet-connected computers, such as MRI's and its clients' servers, including the Computer Fraud and Abuse Act, the Digital Millennium Copyright Act and the Electronic Communications Privacy Act.  As a result of the foregoing conduct by Lynx, MRI has suffered loss and damage, including conducting investigations and taking remedial actions to further secure the information stored on its internet-connected computers, which has cost MRI well in excess of $5,000 in the past year.

163.     In short, all of the forgoing conduct by Defendants  provides MRI Software users the benefits of MRI Software that they have not properly obtained.  In addition, the foregoing conduct by Lynx deprives MRI of the benefit of its substantial investment in the development and constant improvement to the MRI Software.  In each such instance, the value of that benefit is instead pocketed by Defendants.

**K.**    **Lynx's Misrepresentation of Itself at Industry Events.**

164.    In addition to targeting MRI Software users through its website and targeted emails, Defendants have also furthered their illegal business model by posing as affiliates of MRI at industry events.

165.    Prior to the termination of the 2002 Agreement, on several occasions, Lynx -- like numerous other authorized third party service providers -- paid for booth space at MRI International User Group conferences.  When the 2002 Agreement terminated, Defendants had no legitimate purpose to attend the MRI International User Group conferences.

166.    Upon information and belief, Robinson was told that Lynx was not permitted to attend the 2011 International MRI User Group Conference.

167.    Despite being told not to attend, and despite knowing Lynx had no legitimate basis for attending, representatives of Lynx, including at least Robinson and Lori Spale, attended the 2011 MRI International User Group Conference.

168.    The 2011 International MRI User Group Conference was hosted by MRI in an area of a hotel, where access was restricted to authorized attendees.

169.    Mr. Robinson and Ms. Spale lacked the proper credentials to get into the restricted areas of the hotel.  Nevertheless, Mr. Robinson and Ms. Spale went into the restricted area while authorized vendors were setting up their booths.  Upon information and belief, while in the restricted area, Mr. Robinson and Ms. Spale held themselves out as authorized to attend the conference, and obtained confidential information of MRI including confidential information concerning road maps of products, training and MRI consulting solutions.

170.    When MRI became aware of Lynx's presence at the conference, hotel security quickly was notified.

171.    Upon information and belief, Mr. Robinson and Ms. Spale were told that they would be arrested for trespass if they returned to the restricted areas of the hotel.

172.    Upon information and belief, Defendants used the confidential information they obtained at the 2011 MRI International User Group Conference to unfairly compete with MRI on Lynx's behalf.

173.    In addition, upon information and belief, at other industry events, Robinson and Lynx representatives have misrepresented the nature of their affiliation with MRI, their capabilities, their rights to legitimately access and use MRI Software, and their ability to legally offer maintenance and support for the MRI Software that is comparable to MRI's maintenance and support.

174.    On at least one occasion, and upon information and belief, on multiple occasions, soon after connecting with MRI Software users at a MRI User Group conference, Defendants sent targeted emails to MRI International User Group Conference attendees soliciting them to purchase support services from Defendants, instead of MRI.

175.    Defendants, through the aforementioned acts, unfairly compete against MRI for customer support and maintenance services, falsely designates themselves as affiliates of MRI and tortiously interfere with MRI's existing and prospective client relationships.

## COUNT I
## (COPYRIGHT INFRINGEMENT)
## (17 U.S.C. § 501 et seq.)

176.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

177.    MRI owns valid and enforceable copyrights in the Copyrighted Works.

178.    At all times relevant hereto, MRI or its predecessor in interest has owned exclusively all rights in and to the Copyrighted Works, specifically including the copyrights therein.

179.    MRI has secured numerous registrations from the U.S. Copyright office covering the Copyrighted Works, as described above.

180.    Defendants infringed MRI's copyrights by reproducing the Copyrighted Works, in whole or in part, without authorization from MRI, in violation of 17 U.S.C. §106.

181.    Defendants infringed MRI's copyrights by distributing copies of the Copyrighted Works, in whole or in part, without authorization from MRI, in violation of 17 U.S.C. § 106.

182.    Defendants infringed MRI's copyrights by creating derivatives works from the Copyrighted Works without authorization from MRI, in violation of 17 U.S.C. § 106.

183.    Defendants knew or should have known that making or distributing copies of or creating derivative works from MRI's Copyrighted Works infringed MRI's copyrights therein and are thereby liable for willful infringement of such copyrights.

184.    In addition to directly infringing MRI's copyrights, Defendants have contributorily infringed and/or are vicariously liable for infringing or inducing the infringement of MRI's exclusive rights in the Copyrighted Works by knowingly controlling, supervising, directing, causing, encouraging, inducing and/or materially contributing to the copying or distribution of copies of or creation of derivative works from the Copyrighted Works. For example, when Lynx provides customization or Enhancements without authorization, Defendants are vicariously or contributorily liable for the resulting direct copyright infringement by such MRI Software users.

185.     Defendants have obtained a direct financial benefit from the foregoing infringing activities while declining or failing to exercise its right and ability to stop or limit same.

186.     MRI is entitled to damages for Defendants' infringement in an amount to be proven at trial, including both the actual damages suffered by MRI and Defendants' profits attributable to the infringement.  *See* 17 U.S.C. § 504.  Alternatively, upon election before final judgment is entered, MRI is entitled to recover statutory damages.  *Id.*

187.     Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

188.     Further, Defendants' past and continuing infringement of MRI's copyrights has caused and will continue to cause irreparable injury to MRI.  Unless restrained and enjoined, Defendants will continue to commit such acts of infringement.  Monetary damages are not adequate to compensate MRI for such inflicted and threatened injuries, entitling it to additional remedies, including temporary and permanent injunctive relief, pursuant to 17 U.S.C. § 502, and an order impounding and destroying any and all infringing materials, pursuant to 17 U.S.C. § 503.

### COUNT II
### (VIOLATION OF COMPUTER FRAUD AND ABUSE ACT)
### (18 U.S.C. § 1030)

189.     MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

190.     The Portal allows access to certain of MRI's computers, computer systems, and computer networks, which are protected computers within the meaning of 18 U.S.C. §

1030(e)(2). These computers, computer systems, and computer networks are data storage facilities, which are used in and affect interstate and foreign commence, including by providing access to maintenance and support services for MRI Software.

191.    Upon information and belief, Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (a)(2)(C), by directly or indirectly intentionally accessing the Portal and/or other protected computers, without authorization or by exceeding authorized access, and by obtaining information, such as information needed to access, download and install Enhancements to MRI Software, from such protected computers.

192.    Upon information and belief, Lynx has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (a)(4), by knowingly, and with intent to defraud, accessing the Portal and/or other protected computers, without authorization or by exceeding authorized access, and by means of such conduct furthered the intended fraud and obtained one or more things of value. For example, upon information and belief, Defendants have obtained information needed to access and install Enhancement to the MRI Software through the foregoing conduct. The value of the information obtained by Lynx is well in excess of $5,000.

193.    As a result of Defendants' actions, the integrity of data, programs, systems and/or information of MRI has been impaired.

194.    MRI has suffered damage and loss, including without limitation, revenue lost, costs incurred and other consequential damages resulting from Defendants' actions.

195.    MRI has suffered losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5,000 aggregated over a one year period.

196.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing

activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

197.    Defendants' unlawful access to and theft from MRI's computers have caused MRI irreparable injury.

198.    Unless restrained and enjoined, Defendants will continue to commit such acts. MRI's remedies at law are not adequate to compensate it for these injuries, entitling MRI to injunctive relief.

**COUNT III**
**(VIOLATION OF TITLE II OF THE ELECTRONIC COMMUNICATIONS**
**PRIVACY ACT)**
**(18 U.S.C. § 2701)**

199.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

200.    Upon information and belief, Defendants have violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701 et seq., by (a) intentionally accessing without authorization, or by intentionally exceeding an authorization to access, the password protected Portal and/or other protected computers; (b) obtaining access to electronic communications while such communications were in electronic storage; (c) disclosing such communications to third parties not authorized to received them; and (d) conspiring, encouraging, aiding, abetting, and/or participating in efforts to do so.

201.    MRI has been irreparably damaged by Defendants' violations of Title II of the Electronic Communications Privacy Act, and is entitled to damages, injunctive relief, and attorneys' fees and costs pursuant to 18 U.S.C. § 2707.

202.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing

activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

**COUNT IV**
**(VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT)**
**(17 U.S.C. §1201 et seq.)**

203.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

204.    MRI employs certain technological measures, including password protected servers, license keys and date stamps that effectively control access to one or more of the Copyrighted Works, thereby protecting MRI's exclusive rights therein.

205.    Upon information and belief, Defendants circumvented MRI's technological measure(s) and/or provided the means to do so in order to access one or more Copyrighted Works without authorization from MRI, in violation of 17 U.S.C. § 1201.

206.    As a result of Defendants' wrongful actions in circumventing and/or providing means to circumvent technological measures that effectively control access to one or more of the Copyrighted Works, MRI has suffered, and is entitled to recover from Defendants, damages in an amount to be proven at trial. *See* 17 U.S.C. § 1203.  MRI is further entitled to recover from Defendants all profits attributable to Defendants' violations of the foregoing anti-circumvention provisions. *Id*. Alternatively, upon election before final judgment is entered, MRI is entitled to recover statutory damages. *Id*.

207.    Defendants' wrongful actions in circumventing and/or providing means to circumvent technological measures that effectively control access to one or more of the Copyrighted Works have also caused MRI irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Monetary damages are not adequate to

compensate MRI for these inflicted and threatened injuries. Accordingly, MRI is entitled to temporary and permanent injunctive relief. *Id.*

208.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

### COUNT V
### (VIOLATION OF CANADIAN COPYRIGHT ACT)
### (COPYRIGHT ACT OF CANADA (R.S.C., 1985, c. C-42))

209.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

210.    The Copyrighted Works constitute copyrightable subject matter under the laws of Canada.

211.    At all times relevant hereto, MRI or its predecessor in interest has owned exclusively all rights in and to the Copyrighted Works, specifically including the copyrights therein.

212.    Canada is a signatory to the Berne Convention for the Protection of Literary and Artistic Works, pursuant to which it is obligated to extend to works created and first published in the United States the same protections under Canadian law as that applied to works created and first published in Canada.

213.    Defendants have willfully and without MRI's authorization infringed MRI's copyrights by systematically and repeatedly accessing, copying, distributing copies of and creating derivative works from the Copyrighted Works.

214.    To the extent not addressed by the United States copyright law, including without limitation for infringing activity that may have commenced in the United States or been undertaken jointly with persons or entities located in the United States, Defendants have, by their actions alleged herein, directly and indirectly infringed MRI's copyrights in the Copyrighted Works in violation of §§ 27(1)-(2) of the Copyright Act of Canada (R.S.C., 1985, c. C-42).

215.    MRI has been irreparably harmed and will continue to be irreparably harmed by Defendants' violations of the Copyright Act of Canada.

216.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

217.    Accordingly, as owner of an infringed copyright, MRI is entitled to all remedies provided for in the Copyright Act of Canada, including "injunction, damages, accounts, delivery up of infringing materials and otherwise." *Id.* § 34.

**COUNT VI**
**(MISAPPROPRIATION OF CONFIDENTIAL**
**BUSINESS INFORMATION AND/OR TRADE SECRET**
**(O.R.C. 1333.61 - 1333.69)**

218.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

219.    Under its agreements with its clients, MRI issues confidential credentials for accessing the Portal to MRI client DSCs for use only by the authorized DSCs of the client.  In addition, MRI makes available other confidential information on the Portal and/or other protected computers.

220.    The confidential credentials and information are items of independent economic value.

221.    MRI has taken reasonable precautions to ensure the confidential credentials and other information do not become generally known to, or readily ascertainable by, unauthorized individuals.

222.    The value of the confidential credentials and information is derived from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from disclosure or use thereof.

223.    Upon information and belief, without authorization from MRI, Defendants misappropriated the credentials and/or other confidential information and used them for Defendants' benefit.

224.    Defendants' misappropriation of Portal credentials was willful and malicious and caused irreparable damage to MRI.

225.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

## COUNT VII
## (TRESPASS)

226.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

227.    The Portal and other MRI computers are protected by security measures including password protection.

228.    Upon information and belief, Defendants, without authorization or exceeding the scope of authorization, willfully and maliciously entered upon the Portal and/or the protected computers or property.

229.    As a result of Lynx's trespass, MRI has suffered and continues to suffer irreparable damages.

230.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

## COUNT VIII
## (BREACH OF THE 2002 AGREEMENT)

231.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

232.    The 2002 Agreement constituted a valid and enforceable contract between Lynx and Management Reports, Inc., and later, between Lynx and IRES.

233.    The 2002 Agreement was fully assigned to MRI by IRES, and MRI is the successor in interest to IRES and Management Reports, Inc. as to the 2002 Agreement.

234.    MRI and its successors in interests at all times fully complied with all of their obligations to Lynx under the 2002 Agreement.

235.    As further described above, Lynx failed and continue to fail to perform its continuing contractual obligations under the 2002 Agreement and has breached, and continues to breach, one or more of its continuing duties under the 2002 Agreement.

236.    Lynx's failures, alone or in the aggregate, constitute material breaches of the 2002 Agreement.

237.    As a result of Lynx's material breaches, MRI incurred and is entitled to recover against Lynx, among other losses, damages in an amount to be determined at trial.

238.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

## COUNT IX
## (INDUCEMENT OF BREACH OF MRI CLIENT CONTRACTS)

239.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

240.    MRI has entered into Master Agreements, Perpetual Software License and Maintenance and Support Schedules, Order Documents and Professional Services Schedules and other license agreements with its clients.

241.    The foregoing documents constitute valid and enforceable contracts between MRI and its clients.

242.    At all relevant times, Defendants have had knowledge of the existence of the foregoing agreements between MRI and its clients, including the limitations on MRI clients' licenses to the MRI Software.

243.    MRI has at all times fully complied with all of its obligations to its clients under the foregoing contracts.

244.    As further described above, Defendants have actively induced MRI clients to breach the foregoing contracts with MRI by, for example, actively encouraging and enabling MRI clients to exceed the scope of their licenses to the MRI Software under their agreements

with MRI.  Defendants' wrongful acts alleged herein, including violations of state and federal laws, caused MRI clients to be in breach of their agreements with MRI.

245.    The foregoing conduct by MRI clients constitutes a material breach of the clients' agreements with MRI regarding the MRI Software.

246.    Defendants' acted with the desire to interfere with the foregoing contracts to obtain an unfair competitive advantage and/or with the knowledge that such interference was certain or substantially certain to occur as a result of its acts.

247.    As a direct and proximate result of Defendants inducing MRI's clients to breach their agreements with MRI, one or more MRI clients have breached one or more of their duties under their Master Agreements, Perpetual Software License and Maintenance and Support Schedules, Order Documents, Professional Services Schedules and/or other license agreements with MRI.  MRI's clients would have otherwise performed their duties under their contracts were it not for Lynx's acts inducing them to breach.

248.    As a result of Defendants' active inducement, MRI incurred and is entitled to recover against Defendants, among other losses, damages in an amount to be determined at trial.

249.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

250.    Upon information and belief, Defendants' acted with malice in inducing MRI's clients to breach the foregoing contracts, and MRI is therefore entitled to an award of punitive damages to punish Lynx's wrongful conduct and deter future wrongful conduct.

## COUNT X
## (INTENTIONAL, OR IN THE ALTERNATIVE, NEGLIGENT, INTERFERENCE WITH EXISTING AND PROSPECTIVE ECONOMIC ADVANTAGE)

251.   MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

252.   MRI has and has had an expectancy in continuing advantageous economic relationships with current and prospective purchasers and licensees of the MRI Software and MRI's professional services, and maintenance and support services.

253.   These relationships contained the probability of future economic benefit in the form of profitable maintenance and support contracts and software licenses.

254.   Had Defendants refrained from engaging in the unlawful and wrongful conduct described herein, there is a substantial probability that MRI Software users would have initiated, renewed or expanded their maintenance and support agreements and software licenses with MRI, rather than entering into agreements with Lynx.

255.   Defendants were aware of these economic relationships and intended to interfere with and disrupt them by wrongfully:

- luring MRI's prospective and current customers by making promotional and marketing statements regarding Lynx's ability to provide support services for MRI Software that were only possible because of Lynx's improper access to, and use of the MRI Software;

- disparaging MRI's services and contractual offerings;

- providing unauthorized customizations and Enhancements to MRI Software users, which were obtained and/or provided through illegal means; and

- infringing the Copyrighted Works and MRI's Trademarks.

256.   In the alternative, Defendants knew or should have known about the economic relationships between MRI and its current and prospective customers described above, and knew or should have known that these relationships would be interfered with and disrupted if

Defendants failed to act with reasonable care. Defendants failed to act with reasonable care, and instead engaged in the conduct described above.

257.    Defendants conduct constitutes violations of numerous state and federal statutes and codes, including those enumerated herein.

258.    As a result of Defendants' acts, the above-described relationships have been actually disrupted, causing certain current and prospective maintenance and support customers to contract with Lynx instead of with MRI for these customers' software support and maintenance.

259.    As a direct and proximate result of Defendants' actions, MRI has suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers of software maintenance and support services. Defendants' wrongful conduct was a substantial factor in causing this harm.

260.    Unless Defendants are restrained by appropriate injunctive relief, their actions are likely to recur and will cause MRI irreparable injury for which there is no adequate remedy at law.

261.    Defendants' interference with MRI's prospective economic advantage with its current and future customers, as described above, was willful, malicious, oppressive, and in conscious disregard of MRI's rights, and MRI is therefore entitled to an award of punitive damages to punish Defendants' wrongful conduct and deter future wrongful conduct.

262.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

## COUNT XI
## (TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114)

263. MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

264. The acts of Defendants complained of herein constitute infringement of MRI's federally registered MRI Trademark in violation of 15 U.S.C. § 1114(1).

265. Defendants' unauthorized use of the MRI Trademark on Lynx's website www.lynxsystemsinc.com, in promotional materials and in connection with the promotion, sale and providing of Defendants' services and products falsely designate the origin of Lynx's goods and/or services.

266. The unauthorized use of the MRI Trademark on Lynx's website www.lynxsystemsinc.com, in promotional materials and in connection with the promotion, sale and providing of Lynx's services and products are all likely to cause confusion, cause mistake, and/or deceive the relevant public, including consumers and potential consumers of the parties' respective goods and services, at least as to affiliation, connection, or association of Defendants with MRI, or as to the origin, sponsorship, or approval of Defendants' goods or services by MRI.

267. Upon information and belief, Defendants have used the MRI Trademark at least in part to deceive, mislead and confuse the public into believing that MRI is and was the source of Defendants' products or services, or that Defendants' activities are affiliated with MRI, so as to trade on the substantial reputation and goodwill enjoyed by MRI.

268. The conduct of Defendants complained of herein unjustly enriches Defendants at MRI's expense.

269. The conduct of Defendants complained of herein is likely to injure MRI's business reputation.

270.     As a result of Defendants' infringement of the MRI Trademark, MRI has incurred and continues to incur damages consisting of, among other things, diminution in the value of and goodwill associated with the MRI Trademark.

271.     Unless the acts of Defendants are enjoined by this Court, they will continue to cause irreparable injury to MRI and to the public for which there is no adequate remedy at law.

272.     Upon information and belief, Defendants' acts complained of herein have been deliberate, willful, intentional, and in bad faith, with full knowledge and in conscious disregard of MRI's rights in the MRI Trademark, and with an intent to trade on MRI's vast goodwill in the MRI Trademark.  In view of the egregious nature of Lynx's infringement, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

273.     Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

**COUNT XII**
**(FEDERAL UNFAIR COMPETITION, 15 U.S.C. § 1125(a)(1)(A))**

274.     MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

275.     The acts of Defendants complained of herein constitute unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**COUNT XIII**
**(COMMERCIAL DISPARAGEMENT)**

276.     MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

277.    Defendants' verbal and written statements, set forth above, are false, and they were false when they were made. Moreover, Defendants had actual knowledge of the falsity of the statements, or alternatively, made such statements with reckless disregard to their truth or falsity.  Defendants' statements were made intentionally and for the specific purpose to enhance Defendants' business by inducing MRI Software users and potential MRI customers to refrain from doing business with MRI. The statements were not privileged, and were known by Defendants not to be privileged.

278.    The nature and quantity of the statements by Defendants have increased in frequency, and many of Defendants' disparaging statements were made by Robinson, all of which demonstrate Defendants' unlawful intent. Moreover, Defendants' disparagement has been continuous and has occurred as recently as November 20, 2011.

279.    As a direct and proximate result of Lynx's pattern of disparaging statements about MRI's services and contracts, MRI has been irreparably harmed and damaged in its reputation and goodwill and otherwise. MRI has lost profits and sales which it otherwise could have made had the disparaging statements not been published.

280.    Further, by engaging in a pattern of publishing false and disparaging statements about MRI's services and contracts, Defendants acted willfully, with malice, and with wrongful and willful intent to injure MRI in reckless disregard of the rights of MRI, so as to justify an award of punitive and exemplary damages.

281.    As a direct and foreseeable consequence of the actions alleged herein, Defendants are liable to MRI for the actual damages incurred as a result of the unfair competition.  Said damages are not yet ascertainable but will be proven at the time of trial.

282.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

## COUNT XIV
## (FALSE ADVERTISING, 15 U.S.C. § 1125(a)(1)(B))

283.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

284.    Defendants' products and services are available in interstate commerce.

285.    Through their commercial advertising or promotion, Defendants have misrepresented the nature, characteristics, and qualities of its products and services, including their ability to offer support services comparable to MRI's offerings.

286.    Through its commercial advertising or promotion, Defendants have misrepresented the nature, characteristics, and qualities of MRI's services, capabilities and contractual offerings.

287.    Defendants' false commercial messages are material to consumers' decisions to purchase Defendants' products and services.

288.    MRI is likely to be damaged as a result of Defendants' false advertising.

289.    As a direct and foreseeable consequence of the actions alleged herein, Defendants are liable to MRI for the actual damages incurred as a result of the false advertising.

290.    The actual amount of MRI's damages will be proven at trial.

291.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing

activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

## COUNT XV
## (DECEPTIVE TRADE PRACTICES
## OHIO REVISED CODE CHAPTER 4165)

292.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

293.    Defendants made false, misleading, and disparaging statements about the characteristics and quality of MRI's services and contracts, causing a likelihood of confusion and misunderstanding about the characteristics and quality of MRI's contracts and services.

294.    Defendants' false and misleading statements also imputed to MRI unfairness and a want of integrity and fitness for engaging in its trade and business.

295.    In addition, Defendants' unauthorized use of MRI Trademark on its website www.lynxsystemsinc.com, in promotional materials and in connection with the promotion, sale and providing of Defendants' services and products falsely designates the origin of Defendants' goods and/or services.

296.    The unauthorized use of the MRI Trademark on the website www.lynxsystemsinc.com, in promotional materials and in connection with the promotion, sale and providing of Defendants' services and products are all likely to cause confusion, cause mistake, and/or deceive the relevant public, including consumers and potential consumers of the parties' respective goods and services, at least as to affiliation, connection, or association of Defendants with MRI, or as to the origin, sponsorship, or approval of Defendants' goods or services by MRI.

297.    The conduct of Defendants complained of herein constitutes one or more deceptive trade practices in violation of O.R.C. Chapter 4165 inasmuch as such conduct 1) represents Defendants and/or Ly Defendants' products and services, have sponsorship, approval, status, affiliation, or connection with or by, MRI, which they do not have;  2) falsely represents that Defendants have the ability to provide support services and offerings comparable to or better than MRI's offerings; and 3) disparages the goods, services, or business of MRI by false representation of fact.

298.    As a direct and foreseeable consequence of the actions alleged herein, Defendants are liable to MRI for the actual damages incurred as a result of the deceptive practices.

299.    As a direct and proximate result of Defendants' foregoing conduct, MRI has been irreparably harmed and damaged in its reputation and goodwill and otherwise.  MRI has lost profits and sales which it otherwise could have made had the false and misleading statements not been published.  In addition, Defendants have gained or are likely to gain a profit as a consequence of its misconduct in amounts not yet determined.

300.    The manner and amount of damage to MRI likely to be caused by the activity of Defendants complained of herein cannot be fully measured or compensated in economic terms, and so cannot be adequately remedied at law.  As a result, MRI will suffer irreparable harm and this irreparable harm will continue unless Defendants' infringing activities are enjoined during the pendency of this action and thereafter.

301.    Robinson directs and conducts the activities of Lynx as the President and sole officer of Lynx and has actively participated and materially contributed to the foregoing activities, and is therefore directly, contributorily and vicariously liable for the actions of Lynx. Defendants are jointly and severally liable to MRI for the damages incurred.

302.    MRI is entitled to, among other relief, (1) an order enjoining Defendants from further publication and distribution of the false and misleading statements; (2) an order directing Defendants to make corrective statements by the same media and with the same distribution and frequency; and (3) the recovery of its costs and attorney fees.

### COUNT XVI
### (UNJUST ENRICHMENT/RESTITUTION)

303.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

304.    Defendants unjustly received benefits at the expense of MRI through Defendants' wrongful conduct, including Lynx's breach of the 2002 Agreement, Defendants' inducement of breaches of MRI Software users' agreements with MRI, Defendants' interference with MRI's business relationships, and Defendants' other unfair business practices, as well as by Defendants' infringement of the Copyrighted Works and the MRI Trademark, and Lynx's computer fraud concerning the MRI Software.  Lynx continues to unjustly retain the value it obtained as a result of its wrongful conduct.

305.    MRI is entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants by the revenues derived from its wrongful conduct at the expense of MRI as alleged above, and all profits derived from that wrongful conduct.  MRI is further entitled to full restitution of all amounts in which Defendants have been unjustly enriched at MRI's expense.

### COUNT XVII
### (AN ACCOUNTING)

306.    MRI incorporates by reference and restates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

307. Defendants have obtained business and revenue through the use of unlawful conduct including, but not limited to:

- luring MRI's prospective and current customers by making promotional and marketing statements regarding Defendants' ability to provide support services for MRI Software that were only possible because of Defendants' improper access to, and use of the MRI Software;

- disparaging MRI's services and contractual offerings;

- providing unauthorized customizations and Enhancements to MRI Software users, which were obtained and/or provided through illegal means; and

- infringing the Copyrighted Works and MRI's Trademarks.

308. Defendants have received money as a result of their misconduct, at the expense of MRI, and some or all of such money is rightfully due to MRI.

309. The amount of money due from Defendants to MRI is unknown to MRI, and cannot be ascertained without an accounting of the income and gross profits Defendants have obtained through their wrongful and unlawful conduct. MRI is therefore entitled to a full accounting.

PRAYER FOR RELIEF

WHEREFORE, MRI demands that:

A. Defendants, their agents, servants, employees, attorneys, representatives, successors and assigns and all persons, firms, or corporations in active concert or participation with Defendants be enjoined and restrained preliminarily and permanently from:

i. copying, distributing, using, or creating derivative works from the Copyrighted Works in any way, including for any purpose;

ii. facilitating, enabling or inducing the copying, distributing, using or creating of derivative works of any Copyrighted Works by, for, or on behalf of, any MRI

Software user who does not have a valid and existing license from MRI entitling that user to such rights in the Copyrighted Works;

iii.   accessing the Portal or any website or computer controlled by MRI, except subject to a valid and existing Third Party Data Access Agreement signed by MRI, and then only as expressly permitted in that agreement;

iv.   facilitating the access to, use of, or downloading from the Portal, or any computer on which MRI Copyrighted Works are stored, for or on behalf of, any customer other than by using that specific customer's valid credentials from MRI;

v.    directly or indirectly providing or making available any Enhancement to the MRI Software;

vi.   circumventing any of MRI's technological measures and/or providing the means to do so in order to access any Copyrighted Work;

vii.  misappropriating any confidential business information or trade secret of MRI, including any credentials for accessing the Portal;

viii. offering services relating to the MRI Software outside of Canada without MRI's express permission;

ix.   directly or indirectly infringing any MRI Trademark or trade name  in any manner, including generally, but not limited to, engaging in services or distributing, advertising, selling, or offering for sale or distribution any goods or services, which infringes said marks, and specifically using "MRI" as a part of any advertisement, promotion, or solicitation that tends falsely to represent that, or is likely to confuse, mislead or deceive purchasers, Lynx's customers, and other members of the public that Lynx's products or services originate from MRI or that Lynx's products or

services have been sponsored, approved, or licensed by, or are associated with MRI or are in some way connected or affiliated with MRI;

    x.    engaging in any conduct which tends falsely to represent, or is likely to confuse, mislead or deceive purchasers, Lynx's customers, and other members of the public to believe that Lynx is connected with MRI or is sponsored, approved, or licensed by MRI or is in some way connected or affiliated with MRI;

    xi.    falsely, deceptively or misleadingly representing the nature, characteristics, or qualities of Lynx's products and services and capabilities;

    xii.    falsely, deceptively or misleadingly representing the nature, characteristics, or qualities, or offerings of MRI;

    xiii.    publishing any false or disparaging statements about MRI's services, products or offerings;

    xiv.    interfering with or disrupting any prospective or existing relationships between MRI and current or prospective MRI Software users;

    xv.    otherwise engaging in any acts of unfair competition, unfair practices, copyright infringement, trademark infringement, trade name infringement, trespass or computer fraud against MRI;

B. Defendants be ordered, pursuant to 15 U.S.C. § 1118, to deliver up to MRI for destruction all promotional materials, forms, and advertisements in the possession of Defendants bearing "MRI" that is likely to create confusion as to a sponsorship or affiliation of Lynx's products or services by MRI;

C. Defendants be ordered to file with this Court and to serve upon MRI, within 30 days after the entry and service on Defendants of an injunction, a report in writing and under oath

setting forth in detail the manner and form in which Defendants have complied with the injunction;

D.  An order be issued impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503;

E.  An accounting be directed to determine Defendants' profits resulting from its activities and that such profits be paid over to MRI, increased as the Court finds to be just under the circumstances of this case;

F.  Establishment of a constructive trust consisting of the benefit conferred upon Defendants by the revenues derived from its wrongful conduct at the expense of MRI as alleged above, and all profits derived from that wrongful conduct;

G.  MRI receive full restitution of all amounts in which Defendants have been unjustly enriched at MRI's expense through the acts complained of herein;

H.  MRI recover all damages it has sustained as a result of MRI's activities and that said damages be trebled;

I.  An order be issued awarding MRI punitive damages in a sum to be determined at trial;

J.  MRI recover exemplary damages;

K.  MRI recover maximum statutory damages pursuant to 17 U.S.C. § 504;

L.  MRI recover from Defendants MRI's costs of this action, reasonable counsel fees, and prejudgment and postjudgment interest; and

M.  MRI have all other and further relief as the Court may deem just and proper under the circumstances.

Dated: May ___, 2013

Respectfully submitted,


By: /s/ Georgia Yanchar
Daniel J. McMullen (Ohio Bar No. 0034380)
Georgia E. Yanchar (Ohio Bar No. 0071458)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio  44114-1607
Telephone:  (216) 622-8200
Facsimile:  (216) 241-0816
E-mail: dmcmullen@calfee.com
          gyanchar@calfee.com

PLAINTIFF'S DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a jury trial.


Dated:  May ___, 2013                    Respectfully submitted,


                                         By: /s/ Georgia Yanchar
                                         Daniel McMullen (Ohio Bar No. 0034380)
                                         Georgia Yanchar (Ohio Bar No. 0071458)
                                         CALFEE, HALTER & GRISWOLD LLP
                                         The Calfee Building
                                         1405 East Sixth Street
                                         Cleveland, Ohio  44114-1607
                                         Telephone:  (216) 622-8200
                                         Facsimile:  (216) 241-0816
                                         E-mail: dmcmullen@calfee.com
                                                 gyanchar@calfee.com