UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MRI Software, LLC, | Case No. 1:12-cv-01082 |
| Plaintiff, | Judge Christopher A. Boyko |
| vs. | |
| Lynx Systems, Inc., | |
| Defendant. | |

**Lynx Systems, Inc.'s Response to New Evidence
Submitted by MRI Software, LLC in Response to Lynx's Declaration**

Pursuant to the Court's October 30, 2013, Order (ECF # 111), Lynx Systems, Inc. submits this response to the emails proffered by MRI in its response to Lynx's Court-ordered declarations.

Far from showing contempt, the emails attached as Exhibits A through I to MRI's response (ECF # 93) to Don Robinson's April 15, 2013, declaration on behalf of Lynx (ECF # 69, the "Lynx Decl.") is actually evidences of Lynx's compliance with that Order. Those emails show that Lynx accurately communicated limitations imposed on it by the Stipulated Injunction and fundamentally changed the way it provides services to comply with those limitations. Relevant to those emails, Lynx's efforts include working with its clients to ascertain whether they have signed off on MRI's so-called "Master Agreement"—which exceeds its obligations under the Stipulated Injunction since MRI still has not provided proper notice under Section 3(b) of the Stipulated Injunction), having its clients perform certain services on their own behaves, and using resources other than MRI's "Tool Kit." In other words,

those emails show that, while Lynx is still able to provide services to its clients, it has been anything but "business as usual" as MRI asks the Court to believe.

Continuing down its now well-worn path, MRI takes this evidence of Lynx's good-faith and fully-compliant conduct and spins it 180 degrees, arguing that it somehow shows just the opposite. MRI's reasons for doing so are transparent. As its counsel made patently clear at the November 29, 2013, hearing, MRI grossly regrets agreeing to a stipulated injunction that allows Lynx to continue providing services to its clients, albeit in significantly altered ways from what it did before entry of the Stipulated Injunction. Instead, MRI wishes that the Stipulated Injunction actually prohibited Lynx from providing any services whatsoever relating in any way to MRI's software. But that was not the parties' agreement, and MRI must live with the agreement it made. No matter the degree of MRI's "buyers' remorse," Lynx has made all of the fundamental changes to its business necessary to comply with the Stipulated Injunction, and it is entitled to the benefit of its bargain with MRI.

Thus, for the reasons set forth in detail below, the emails attached to MRI's Response are not evidence of any violation of the Stipulated Injunction. The Court therefore should deny MRI's show cause motion for these reasons, which are supported by the Supplemental Declaration of Don Robinson (the "Supp. Decl.") attached as Exhibit A, and for the other the reasons previously stated by Lynx.

A. **Realty Mortgage – Exhibit A**

The first email MRI submitted reflects Lynx's honest and forthright communications with its clients regarding the restrictions imposed by the

Stipulated Injunction. Despite MRI not providing written notice to Lynx as expressly required under Section 3(b) of the Stipulated Injunction, Lynx told Realty & Mortgage Co. that it would have to request authorization from MRI "to have Lynx Systems continue to support and create custom reports" for it. (Dec. 4, 2012 email from Hugh Rider, attached as Exhibit A to MRI's Response.) In response, Hugh Rider of Realty & Mortgage relayed MRI's answer, as follows:

> Mas [Mari of MRI] indicated that they [meaning MRI] were not going to respond to the request in any official capacity but they understood that Lynx was going to continue supporting MRI in the future. The request for authorization was if no official response was received then we assumed it was granted.

(*Id.*) MRI's response is telling: rather than telling Realty & Mortgage that it could not work with Lynx under the Stipulated Injunction as it now asks the Court to do for it, MRI instead decided to sit silent and give its tacit approval by expressly *declining* to provide any response whatsoever.

Even more telling is how Lynx responded to MRI's decision to remain silent. Truthfully communicating the restrictions imposed by the Stipulated Injunction, and in fact going further than what the Stipulated Injunction actually requires, Don Robinson responded as follows to Realty & Mortgage:

> I had a discussion with my lawyer in response to our discussion this morning.
>
> … [MRI is] suing us based upon a clause that you agreed to in your agreement with them. They have prohibited us from dealing with clients who have signed the new support agreement without prior written approval from them.
>
> Based on what we have been told, you need them to sign a "Data Access Agreement" approving Lynx before we can assist you.

> If they won't respond officially or refuse to approve us, you may have to refer it to your legal team.
>
> I'm not sure what other options we have since they have tied our hands.

(December 4, 2012, email from Don Robinson, attached as Exhibit A to MRI's Response.) There is nothing false about anything that Don Robinson communicated to Realty & Mortgage. Indeed, it is more solicitous to MRI than the Stipulated Injunction itself. But to MRI, more than is required apparently is still not enough.

As set forth in Lynx's prior briefing, and as detailed at the October 29 hearing, MRI *can* grant any of its clients the right to continue working with Lynx. That is expressly permitted under Section 1.7 of the "Master Agreement" that MRI filed under seal as ECF # 15. Moreover, MRI can at its discretion withdraw its designation of any client as a "Master Agreement Signatory" under Section 3(b) of the Stipulated Injunction (assuming that it provided proper notice in the first instance, which it has not), and it can always negotiate new terms with a client to allow it to work with Lynx. Thus, there is nothing in the Stipulated Injunction that precludes Lynx from communicating those facts to its clients. The emails MRI submitted as Exhibit A to its response therefore are evidence of Lynx's compliance with the Stipulated Injunction, not a violation as MRI argues.

B. **BlueStone – Exhibits B and D**

The emails between Lynx and BlueStone Properties Inc. submitted by MRI as Exhibits B and D to its Response also are not evidence of a violation. According to MRI, the first email to BlueStone is a false communication that violates Section 2(m) of the Stipulated Injunction, and the second email is evidence that Lynx

interacted with, exercised control over or otherwise used MRI Software installed on the computers of a Master Agreement Signatory in violation of Section 2(c) of the Stipulated Injunction. Neither argument by MRI is correct.

The first email, Exhibit B to MRI's Response, consists of an inquiry from BlueStone asking Lynx to provide services that MRI contends are prohibited under the Stipulated Injunction. Responding to that inquiry, which Lynx did not solicit, Lynx indicated that BlueStone had to confirm with MRI whether Lynx could provide the requested services. (December 27, 2012, email from Rajesh Patel, attached as Exhibit B to MRI's Response.) That is not evidence of a violation of the Stipulated Protective Order. Indeed, the opposite is true. It is evidence of Lynx's sincere, good-faith efforts to communicate honestly with its clients about the Stipulated Injunction even though MRI has for more than eight months declined to provide proper notice under Section 3(b) and its attempt to comply fully with its terms as if MRI had, in fact, provided such notice.

The second email between Lynx and BlueStone, submitted by MRI as Exhibit D to its Response, also is not evidence of any violation of the Stipulated Injunction. Attempting to manufacture out of whole cloth an issue where none actually exists, MRI literally changes what that email says by *inserting new words* (underlined below) that Lynx never wrote:

> a request from a Lynx employee "for remote logon information to the [customer's] new server" so the employee can "review the [<u>MRI Software-related</u>] issues and fix them for you.

(MRI Br. at 13 (emphasis added).) The words "MRI Software-related" do not appear in Lynx's actual email, and MRI's insertion of those words completely

mischaracterizes what Lynx did for BlueStone. Contrary to MRI's abuse of editorial discretion unsupportable edit, Lynx did not access the MRI Software. (Supp. Decl. ¶ 3.) On the contrary, Lynx logged in to the Microsoft Windows software running on BlueStone's new servers—which is expressly permitted by Section 3(a) of the Stipulated Injunction—and changed a setting within the client's Microsoft server software. (*Id.*) *At no point did Lynx log into or otherwise access any MRI Software running on BlueStone's computers.* (*Id.*) The emails submitted as Exhibit D to MRI's response therefore are not evidence of any violation of the Stipulated Injunction.

C. **Build Toronto – Exhibits C and E**

The emails submitted by MRI as Exhibits C and E to its Response also are not evidence of a violation of the Stipulated Protective Order. While MRI identifies those emails as being between Lynx and a single client, namely Build Toronto, that nomenclature actually relates to two different entities. (Supp. Decl. ¶¶ 4-6.) A brief overview of those two entities and how they came about is therefore needed.

Lynx initially sold the relevant MRI system to the City of Toronto Economic Development Corporation (or "TEDCO"), which is owned by the City of Toronto and has been known as Toronto Port Lands Company (or "TPLC") since 2009. (Supp. Decl. ¶ 4.) To Lynx's knowledge, TEDCO/TPLC has not signed MRI's so-called "Master Agreement." (*Id.*) In 2008, TEDCO underwent a reorganization where part of its portfolio and staff was split into a new entity, Build Toronto, Inc. (*Id.* at ¶ 5.) The two entities then shared the same TEDCO/TPLC MRI system until 2012, when their combined growth necessitated purchase of additional user licenses. (*Id.*) Based

on MRI's then-current pricing structure, TPLC and Build Toronto determined that it would be more economical for TEDCO/TPLC to retain the existing system and for Build Toronto to acquire a new MRI system for its own use going forward. (*Id.*) Thus, from mid-2012 forward, what had been administered as a single system became two separate systems, with the TPLC system not being subject to the "Master Agreement" terms and, to Lynx's understanding, Build Toronto being subject to the "Master Agreement" terms. (*Id.*)

While TPLC and Build Toronto now have separate MRI systems, they continue to be administered by the same IT support personnel. (Supp. Decl. ¶ 6.) Thus, Lynx has been extremely careful and diligent in how it has provided services to Build Toronto (despite MRI;s failure to provide good notice that Build Toronto is a "Master Agreement Signatory" under the Stipulated Injunction). (*Id.*) Don Robinson previously addressed this in his April 16, 2013, declaration, as follows:

> ... Lynx specifically has instructed its clients to <u>not</u> permit such access [to the MRI Software] and Lynx has not asked any of its clients to grant it such access. and its clients have followed that instruction to a tee. An example of such communications [is] attached as Exhibit H.

(Robinson Dec., ECF 69, ¶ 80.) Of particular importance to the present issue, the email attached as Exhibit H to Don Robinson's declaration is a February 13, 2013, email string between Kathryn Truman of Build Toronto and Raj Patel of Lynx in which Mr. Patel confirmed that, while Lynx can view what is on Build Toronto's screen, it cannot exercise any control over the MRI Software itself. (*See id.* at ¶ 80 & Exh. H.) Lynx then re-confirmed that restriction with *both* Build Toronto *and* TEDCO/TPLC, as shown in the April 2013 emails between Lynx on one hand and

Kathryn Truman of Build Toronto and Ashutosh Sanghvi of TPLC on the other hand. (Supp. Decl. ¶ 6 & Exh. A.) In those emails, Lynx affirmed to both entities that it could not access the Build Toronto system, and Build Toronto received a pricing concession based on the fact that it now had to perform work that Lynx itself had been doing before the Stipulated Injunction. (*Id.*)

With that in mind, neither Exhibit C nor Exhibit E to MRI's Response are evidence of a violation of the Stipulated Injunction. While the emails MRI submitted as Exhibit C do not indicate which entity's installation was at issue, they indicate that the issues related to the 2010 records. Those records predate Build Toronto's acquisition of its new system by two years, and Lynx does not have access to Build Toronto's database. (Supp. Decl. ¶ 7.) Beyond that, Lynx confirmed that it filed its records relating to these services under TEDCO/TPLC, not Build Toronto. (*Id.*) With respect to Exhibit E, the request for service came from Vivian Wong of Build Toronto, but the services were actually completed by Build Toronto employee Kathryn Truman. (*Id.* at ¶ 8.) The emails that MRI submitted therefore are nothing more than its confirmation to Ms. Wong that the services she requested were completed according to the established practice between Lynx and Build Toronto, whereby Ms. Truman actually performed those services. (*Id.*) Those emails therefore are not evidence of a violation of the Stipulated Protective Order by Lynx.

D.  <u>Midwest Property Management – Exhibit F</u>

The emails between Lynx and Midwest Property Management are not evidence of a violation of the Stipulated Protective Order because MRI has not

identified that client as a "Master Agreement Signatory." MRI in its response claims that it identified Midwest Property Management as a "Master Agreement Signatory" in February 2013. (MRI Response at 13.) However, MRI's February 2013 notice to Lynx's counsel (which it designated under the Stipulated Protective Order) does *not* identify Midwest Property Management as a "Master Agreement Signatory." (*See* Feb. 18, 2013, email filed under seal by MRI as Exh. I to ECF # 58.) Moreover, Lynx specifically enquired of Midwest Property Management on that question and was informed that it had not executed MRI's new agreement. (Supp. Decl. ¶ 9.) The emails submitted by MRI as Exhibit F to its response therefore are not evidence of a violation of the Stipulated Injunction.

E.   <u>NAI Hiffman – Exhibit G</u>

According to MRI, an email from Lynx to NAI Hiffman is evidence that Lynx distributed a copy of the MRI Software in violation of Section 2(a) of the Stipulated Injunction. That email includes as an attachment a data-mapping script authored by Lynx employee Howard Mednick to help NAI Hiffman extract *its own data* from *its own* database for *its own internal use*. Despite having not written a single character of the code that comprises the data-mapping script, MRI incredibly claims that it the data-mapping script that Mr. Mednick wrote on Lynx's behalf constitutes "MRI Software" because it references "table names and field names from the MRI database schema." (MRI Response at 15.) Aside from its defiance of common sense, MRI's position is demonstrably wrong for several reasons.

{4554307;}                                              9

First and foremost, MRI's argument is wrong at a technical level. As Don Robinson set forth in his April 16, 2013 Declaration, the "database schema" defines how data is organized within a database, but not the data itself. (Robinson Dec., ECF # 69 ¶ 89.) Referring to the specific case of a "data map" such as what Lynx provided to NAI Hiffman to illustrate this distinction, Don Robinson explains:

> A data map is used to transfer data from one layout to another, either to an internal software memory within the software or to another database, and data mapping is the process of creating data element mappings between two distinct data models. a data map therefore can be understood as a sort of "traffic cop" that makes sure that the data going out of a database goes where it should for a specific client's needs.

(*Id.* at ¶ 90.) When Lynx creates a data map—like the one it sent to NAI Hiffman— it "uses client-specific data maps to extract its clients' own data <u>without accessing the MRI Software database schema</u>" and then "transform[s] that data into a format that Lynx itself has defined for its clients[.]" (*Id.* at ¶ 92; emphasis in original.) Thus, it "does not make sense, and it would be technically incorrect, to say that Lynx has accessed and copied the data schema for the MRI Software" to map a client's data for use in a third-party tool such as Microsoft SharePoint, Microsoft SSRS or Microsoft Excel, as it did for NAI Hiffman. (*Id.* at ¶ 93.) MRI has not presented any evidence *contra* to Don Robinson's testimony on this issue, so it stands undisputed that Lynx's creation and use of data maps such as the one it provided to NAI Hiffman does not constitute distribution of "MRI Software" in violation of Section 2(a) of the Stipulated Injunction.

MRI's argument also is contrary to the actual language of the Stipulated Injunction. In negotiating the Stipulated Injunction, MRI expressly agreed in

{4554307;}                                          10

Section 3(c) that Lynx is allowed to create interfaces that directly access a client's data. That section provides:

> To avoid any ambiguity, "Customization" excludes reports or interfaces that are developed solely using third party software and do not result in any modification to any part of the MRI Software.

(Stipulated Injunction § 3(c).) That is precisely what Lynx did with NAI Hiffman: it created a data-mapping script that could interface directly with its client's database without causing any modification to any part of the MRI Software. (Supp. Decl. ¶ 10.) Despite having agreed to this express exclusion, MRI asks the Court to ignore it by characterizing Lynx's data-mapping script as somehow "distributing" the "MRI Software" in violation Section 2(a) of the Stipulated Injunction. But that cannot be correct. Beyond the fact that the data-mapping script was written by Lynx from scratch, MRI's argument would render the express permission it granted to Lynx to create such an interface in Section 3(c) completely illusory since, by definition, any interface necessarily must know how a client's data is stored. (*See* Robinson Dec. ¶¶ 94, 96.) Acceptance of MRI's argument thus would allow MRI to claim a violation of Section 2(a) for <u>any</u> interface created by Lynx irrespective of the express consent it granted to Lynx under Section 3(c). Put simply, while MRI may which it had not, it unequivocally agreed that Lynx could create interfaces, and that is all Lynx did for NAI Hiffman.

Finally, acceptance of MRI's argument would be contrary to the highly-persuasive and directly-analogous holding in *Assessment Technologies of WI, LLC v. Wiredata*, 350 F.3d 640 (7th Cir. 2003). In that case, the Seventh Circuit squarely rejected a similar "attempt of a copyright owner to use copyright law to block access

to data that are neither copyrightable nor copyrighted, but were not created or obtained by the copyright owner," finding that "[i]t would be appalling if such an attempt could succeed." *Id.* at 641-42. That is exactly what MRI is trying to do here, and it too should be rejected by this Court. That is particularly true considering MRI's blatant mischaracterization of the validity of the *Assessment Technologies* opinion in this District. While MRI repeatedly has claimed that Judge Gwin rejected that opinion as bad law in his opinion in *Snap-On Business Solutions Inc. v. O'Neil & Associates, Inc.*, 708 F. Supp. 2d 669 (N.D. Ohio 2010), that is not correct. Instead, Judge Gwin only distinguished *Assessment Technologies* from the facts in the case before him, where the plaintiff claimed copyrights in "improvements" to the client's data, which the relevant agreements defined as the plaintiff's property. *See id.* at 673. Those "improvements" included scanned images of paper catalog pages and service manuals that the plaintiff created and then formatted for online use. *Id.* Judge Gwin thus denied the defendant's summary judgment motion based on a genuine issue of material fact as to whether the plaintiff had copyrights in the client data itself. *Id.* at 684-86. Here, MRI's agreements with its clients expressly state that the client—not MRI—owns the data at issue. (*See* Master Agreement, ECF # 15, at § 2 (defining "Client Data"), § 6.3 (ownership of "Client Data").) Thus, unlike in *Snap-On,* this case is on all-fours with *Assessment Technologies,* as confirmed by Don Robinson's highly-detailed testimony set forth in paragraphs 97-102 of his Declaration. The emails submitted by MRI as Exhibit G therefore are not evidence of any violation of the Stipulated Injunction.

F. **Edon Management – Exhibit H**

The emails between Lynx and Edon Management are not evidence that Lynx distributed a "Customization" in violation of Section 2(d) of the Stipulated Injunction. While those emails contain a colloquial reference to a "customization" by a Lynx employee, that does not perforce constitute evidence that Lynx distributed a "Customization" as a term of art defined in the Stipulated Injunction. In truth, the "Customization" at issue was created and implemented for Edon Management <u>before</u> entry of the Stipulated Injunction. (Supp. Decl. ¶ 11.) All Lynx did in connection with the email MRI cites was to <u>advise</u> its client on how it could move the already-existing Customization from its "Test" computing environment to its "Production" computing environment. That is specifically described in the 12:13 p.m. email sent by Ursula Valentine of Lynx to Bonnie Hucul of Edon Management on February 28, 2013. Lynx therefore did <u>not</u> distribute any "Customization" in violation of the Stipulated Injunction or otherwise access Edon Management's MRI Software. (*Id.*) The emails submitted by MRI as Exhibit H to its response therefore are not evidence of any violation of the Stipulated Injunction.

G. **Media Real Estate – Exhibit I**

Finally, the emails between Lynx and Media Real Estate are not evidence that Lynx distributed a "Customization" in violation of Section 2(d) of the Stipulated Injunction. Media Real Estate is a sophisticated user of the MRI Software, and it has its own in-house development team and its own copy of MRI's Report Development Tool. (Supp. Decl. ¶ 12.) Lynx has, on occasion, consulted with

Media Real Estate with respect to certain Customizations, but it has not itself developed or distributed such Customizations itself during the relevant period. (*Id.*) Moreover, the emails that MRI submitted indicate only that Lynx a quotation for such services, not that it actually provided any services in violation of the Stipulated Protective Order. The emails submitted by MRI as Exhibit I to its response therefore are not evidence of any violation of the Stipulated Injunction.

## Conclusion

For these reasons, the emails most recently submitted to the Court by MRI do not evidence any violation of the Stipulated Protective Order by Lynx. The Court therefore should deny MRI's show cause motion.

Respectfully submitted,

Dated: November 1, 2013

/s/ David T. Movius
David T. Movius (OH 0070132)
*dmovius@mcdonaldhopkins.com*
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474

John T. McLandrich (OH 0021494)
*jmclandrich@mrrlaw.com*
MAZANEC, RASKIN & RYDER CO., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, Ohio 44139
t 440.248.7906 │ f 440.248.8861

*Attorneys for Lynx Systems, Inc.*

## Certificate of Service

I hereby certify that, on November 1, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

/s/ David T. Movius
*Attorney for Lynx Systems, Inc.*
