UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MRI Software, LLC, | ) | Case No..: 1:12-CV-01082 |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| vs. | ) | |
| | ) | |
| Lynx Systems, Inc., | ) | **(Jury Demand Endorsed Hereon)** |
| | ) | |
| Defendant. | ) | |

### Donald Robinson's Answer to MRI Software, Inc.'s First Amended Complaint, Affirmative Defenses and Counterclaim

Donald Robinson ("Don Robinson"), by and through counsel, for its answer to MRI Software, LLC's ("MRI") Amended Complaint, states as follows:

1.     Don Robinson admits that MRI purports to set forth certain claims, denies any liability thereunder, and otherwise denies the allegations in paragraph 1 of the Amended Complaint.

2.     Don Robinson denies the allegations in paragraph 2 of the Amended Complaint.

3.     Don Robinson denies for lack of knowledge the allegations in paragraphs 3 and 4 of the Amended Complaint, as none are alleged against or relate to him  personally.

4.     Don Robinson admits that he is its President and that he manages and has oversight over certain aspects of its business and otherwise denies the allegations in paragraph 5 of the Amended Complaint.

5.     Don Robinson denies that he stole anything from MRI and otherwise denies for lack of knowledge the allegations in paragraph 6 of the Amended Complaint.

6.     Don Robinson denies the allegations in paragraph 7 of the Amended Complaint.

7.     Don Robinson admits the allegations in paragraphs 8 and 9 of the Amended Complaint.

8.     Don Robinson admits that he has an ability to supervise and exercise certain control certain aspects of its business and otherwise denies the allegations in paragraph 10 of the Amended Complaint.

9.     Don Robinson denies the allegations in paragraph 11 through 19 of the Amended Complaint.

10.     Don Robinson admits that the Court has subject matter jurisdiction over some, but not all, of the MRI's asserted claims, denies liability under such claims, and otherwise denies the allegations in paragraph 20 of the Amended Complaint.

11.     Don Robinson admits that the Court has supplemental jurisdiction over at least some of MRI's pendent state law claims, denies liability under any such claims, and otherwise denies the  allegations in paragraph 21 of the Amended Complaint.

12.     Don Robinson denies that venue is proper in this Court, denies that the Court has personal jurisdiction over him and otherwise denies the allegations in paragraphs 22 through 26 of the Amended Complaint.

13.     Don Robinson denies for lack of knowledge the allegations in paragraphs 27 through 33 of the Amended Complaint.

14.     Don Robinson admits MRI offers certain software for the residential and commercial real estate market and otherwise denies for lack of knowledge the allegations in paragraphs 34 through 36 of the Amended Complaint.

15.     Don Robinson denies the allegations in paragraph 37 of the Amended Complaint.

16.     Don Robinson admits that the United States Copyright Office has issued the identified registration certificates, which speak for themselves, and otherwise denies the allegations in paragraph 37 through 39 of the Amended Complaint.

17.     Don Robinson admits that the U.S. Patent and Trademark Office issued the identified trademark registration certificate, which speaks for itself, and otherwise denies the allegations in paragraphs 40 through 44 of the Amended Complaint

18.     Don Robinson denies the allegations in paragraph 45 of the Amended Complaint as constituting a legal conclusion to which no response is required.

19.     Don Robinson denies for lack of knowledge the allegations in paragraphs 46 of the Amended Complaint.

20.     Don Robinson admits that MRI has entered into certain agreements, which speak for themselves, and otherwise denies for lack of knowledge the allegations in paragraphs 47 through 55 of the Amended Complaint.

21.     Don Robinson denies for lack of knowledge the allegations in paragraph 56 of the Amended Complaint.

22.     Don Robinson admits that so-called "customizations" can be implemented using the "Application Tool Kit" and otherwise denies the allegations in paragraph 57 of the Amended Complaint.

23.     Don Robinson denies for lack of knowledge the allegations in paragraph 58 through 60 of the Amended Complaint.

24.     Don Robinson admits that MRI has provided certain updates from time to time and otherwise denies the allegations in paragraph 61 of the Amended Complaint.

25.     Don Robinson denies for lack of knowledge the allegations in paragraph 62 and 63 of the Amended Complaint.

26.     Don Robinson answers the Master Agreement speaks for itself and otherwise denies for lack of knowledge the allegations in paragraph 64 through 68 of the Amended Complaint.

27.     Don Robinson denies for lack of knowledge the allegations in paragraph 69 through 77 of the Amended Complaint.

28.     Don Robinson admits MRI holds yearly international user conferences that may provide an opportunity for interaction between MRI personnel and clients and otherwise denies for lack of knowledge the allegations in paragraph 78 of the Amended Complaint.

29.     Don Robinson denies for lack of knowledge the allegations in paragraph 79 through 82 of the Amended Complaint.

30.     Don Robinson denies the allegations in   paragraph 83 of the Amended Complaint.

31.     Don Robinson admits that Lynx and MRI entered into the 2002 Agreement, which agreement speaks for itself, and further states that the 2002 Agreement was modified by the parties such that the 2002 Agreement as attached to the Complaint and defined by MRI as the "2002 Agreement" in its Amended Complaint does not set forth the entire agreement between the parties. Don Robinson further states that he is not a party to the 2002 Agreement and otherwise denies the allegations in paragraph 84 of the Amended Complaint.

32.     Don Robinson admits that he participated in the negotiation of the 2002 Agreement and executed that agreement solely in his capacity as a representative of Lynx and otherwise denies the allegations in paragraph 85 of the Amended Complaint.

33.     Don Robinson admits that Lynx and MRI entered into the 2002 Agreement, which agreement speaks for itself, and further states that the 2002 Agreement was modified by the parties such that the 2002 Agreement as attached to the Complaint and defined by MRI as the "2002 Agreement" in its Amended Complaint does not set forth the entire agreement between the parties. Don Robinson further states that he is not a party to the 2002 Agreement and otherwise denies the allegations in paragraphs 86 through 94 of the Amended Complaint.

34.     Don Robinson denies for lack of knowledge the allegations in paragraph 95 of the Amended Complaint, as none are alleged against or relate to him  personally.

35.     Don Robinson admits that he engaged in certain discussions with MRI on behalf of Lynx and MRI in or about 2006 and 2007 and that he attended a meeting with MRI, and otherwise denies the allegations in paragraph 96 of the Amended Complaint.

36.     Don Robinson admits that he personally did not enter into an agreement with MRI and otherwise denies the allegations in paragraph 97 of the Amended Complaint.

37.     Don Robinson admits that Lynx and MRI entered into the 2002 Agreement, which agreement speaks for itself, and further states that the 2002 Agreement was modified by the parties such that the 2002 Agreement as attached to the Complaint and defined by MRI as the "2002 Agreement" in its Amended Complaint does not set forth the entire agreement between the parties. Don Robinson further states that he is not a party to the 2002 Agreement and otherwise denies the allegations in paragraphs 98 and 99 of the Amended Complaint.

38.     Don Robinson denies the allegations in paragraph 100 of the Amended Complaint.

39.     Don Robinson denies for lack of knowledge the allegations in paragraphs 101 through 107 of the Amended Complaint, as none are alleged against or relate to him personally.

40.     Don Robinson denies publishing anything on Lynx's website and otherwise denies the allegations in paragraphs 108 through 110 of the Amended Complaint.

41.     Don Robinson denies for lack of knowledge the allegations in paragraphs 111 and 112 of the Amended Complaint, as none are alleged against or relate to him  personally.

42.     Don Robinson denies publishing anything on Lynx's website and otherwise denies the allegations in paragraph 113 of the Amended Complaint.

43.     Don Robinson denies for lack of knowledge the allegations in paragraphs 114 through 117 of the Amended Complaint, as none are alleged against or relate to him personally.

44.     Don Robinson denies the allegations in paragraph 118 of the Amended Complaint.

45.     Don Robinson denies for lack of knowledge the allegations in paragraph 119 and 120 of the Amended Complaint, as none are alleged against or relate to him personally.

46.     Don Robinson admits that the referenced emails speak for themselves, denies that the referenced emails include any false, disparaging, misleading or otherwise improper statements, and otherwise denies the allegations in paragraphs 121 through 131 of the Amended Complaint.

47.     Don Robinson admits that certain emails were sent to in Canada, the United States and Bermuda and otherwise denies the allegations in paragraph 132 of the Amended Complaint.

48.     Don Robinson admits said email includes the letters "MRI" and otherwise denies the allegations in paragraph 133 of the Amended Complaint.

49.     Don Robinson denies the allegations in paragraph 134 through 138 of the Amended Complaint.

50.     Don Robinson states that the attached agreement speaks for itself, denies any violation of law, denies that he had or has any obligation to be approved by MRI or to enter into a Third Party Data Access Agreement with MRI, and otherwise denies the allegations in paragraph 139 of the Amended Complaint.

51.     Don Robinson denies the allegations in paragraph 140 through 145 of the Amended Complaint.

52.     Don Robinson denies for lack of knowledge the allegations in paragraph 146 of the Amended Complaint, as none are alleged against or relate to him personally.

53.     Don Robinson denies the allegations in paragraph 147 and 148 of the Amended Complaint.

54.     Don Robinson admits that it has not entered into a Third Party Data Access Agreement with MRI and otherwise denies the allegations in paragraph 149 of the Amended Complaint.

55.     Don Robinson denies the allegations in paragraph 150 through 164 of the Amended Complaint.

56.     Don Robinson admits he attended and participated in certain International User Group conferences and otherwise denies the allegations in paragraph 165 of the Amended Complaint.

57.     Don Robinson denies the allegations in paragraphs 166 through 175 of the Amended Complaint. Further responding, Don Robinson admits Mr. Robinson was present at a hotel during the 2011 International MRI User Group Conference, but denies entering into any restricted activities or areas and denies any unlawful or improper conduct.

58.      In response to paragraph 176 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

59.     Don Robinson denies the allegations in paragraph 177 of the Amended Complaint.

60.     Don Robinson denies for lack of knowledge the allegations in paragraph 178 and 179 of the Amended Complaint.

61.     Don Robinson denies the allegations in paragraph 180 through 188 of the Amended Complaint.

62.     In response to paragraph 189 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

63.     Don Robinson denies the allegations in paragraph 190 through 198 of the Amended Complaint.

64.     In response to paragraph 199 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

65.     Don Robinson denies the allegations in paragraph 200 through 202 of the Amended Complaint.

66.     In response to paragraph 203 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

67.     Don Robinson denies the allegations in paragraph 204 of the Amended Complaint.

68.     Don Robinson denies the allegations in paragraph 205 through 208 of the Amended Complaint.

69.     In response to paragraph 209 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

70.     Don Robinson denies for lack of knowledge the allegations in paragraph 210 and 211 of the Amended Complaint.

71.     In response to paragraph 212 of the Amended Complaint, Don Robinson avers that the allegations contained therein constitute a legal conclusion to which no response is required and therefore denies the same.

72.     Don Robinson denies the allegations in paragraph 213 through 217 of the Amended Complaint.

73.     In response to paragraph 218 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

74.     Don Robinson denies for lack of knowledge the allegations in paragraph 219 through 222 of the Amended Complaint.

75.     Don Robinson denies the allegations in paragraph 223 through 225 of the Amended Complaint.

76.     In response to paragraph 226 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

77.     Don Robinson denies for lack of knowledge the allegations in paragraph 227 of the Amended Complaint.

78.     Don Robinson denies the allegations in paragraph 228 through 230 of the Amended Complaint.

79.     In response to paragraph 231 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

80.     The Court having dismissed Count VIII against him, Don Robinson denies paragraphs 232 through 238 of the Amended Complaint.

81.     In response to paragraph 239 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

82.     Don Robinson denies for lack of knowledge the allegations in paragraph 240 through 243 of the Amended Complaint.

83.     Don Robinson denies the allegations in paragraph 244 through 250 of the Amended Complaint.

84.     In response to paragraph 251 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

85.     Don Robinson denies for lack of knowledge the allegations in paragraphs 252 through 254 of the Amended Complaint and otherwise denies engaging in any unlawful conduct.

86.     Don Robinson denies the allegations in paragraph 255 through 262 of the Amended Complaint.

87.     In response to paragraph 263 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

88.     Don Robinson denies the allegations in paragraph 264 through 273 of the Amended Complaint.

89.     In response to paragraph 274 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

90.     Don Robinson denies the allegations in paragraph 275 of the Amended Complaint.

91.     In response to paragraph 276 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

92.     Don Robinson denies the allegations in paragraph 277 through 282 of the Amended Complaint.

93.     In response to paragraph 283 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

94.     Don Robinson denies the allegations in paragraph 284 through 291 of the Amended Complaint.

95.     In response to paragraph 292 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

96.     Don Robinson denies the allegations in paragraph 293 through 302 of the Amended Complaint.

97.     In response to paragraph 303 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

98.     Don Robinson denies the allegations in paragraph 304 and 305 of the Amended Complaint.

99.     In response to paragraph 306 of the Amended Complaint, Don Robinson re-alleges and re-avers all the admissions, averments and denials in response to the preceding paragraphs of the Amended Complaint as if fully rewritten herein.

100.    Don Robinson denies the allegations in paragraph 307 through 309 of the Amended Complaint.

101.    Don Robinson denies that MRI is entitled to the relief requested in the prayer contained subsequent to Paragraph 309 of the Amended Complaint.

102.    Further answering, Don Robinson denies all allegations set forth in the Amended Complaint that are not otherwise expressly admitted herein.

**<u>Affirmative Defenses</u>**

103.     The Court lacks subject matter jurisdiction over MRI's claims brought under Canadian law.

104.     The Court lacks personal jurisdiction over Don Robinson.

105.     The Due Process Clause to the United States Constitution and other laws prohibit applying U.S. federal and state laws to Don Robinson's conduct in Canada.

106.     MRI failed to provide sufficient process and sufficient service of process.

107.     MRI fails to state a claim upon which relief can be granted.

108.     MRI's claims are barred by the doctrines of laches, equitable estoppel, promissory estoppel, waiver, consent, or acquiescence.

109.     MRI's claims are barred by the doctrine of unclean hands.

110.     MRI's damages, if any, were caused or contributed to by its own action or inaction or by the action or inaction of third-persons over whom Don Robinson has no ownership or control.

111.     MRI's claims against Don Robinson are barred under applicable Canadian law.

112.     MRI's claims are barred, in whole or in party, by its failure to mitigate its damages, if any.

113.     MRI's demand for punitive damages is barred by the Due Process Clause of the Fifth Amendment to the United States Constitution and similar provisions of any applicable state constitution.

114.     MRI's claims are barred, in whole or in part, because MRI has misused its copyrights by, among other things, requiring customers to sign agreements that purport to substantially restrict their ability to contract with third parties for service and support and by filing and maintaining this objectively baseless lawsuit, in bad faith, to obtain an unfair commercial advantage when it knew or should have known that it has no viable claim of copyright infringement against Don Robinson.

115.     MRI's claims are barred, in whole or in part, because MRI has misused its trademarks by, among other things, filing and maintaining this objectively baseless lawsuit, in bad faith, to obtain an unfair commercial advantage when it knew or should have known that it has no viable claim of trademark infringement against Don Robinson.

116.     MRI's claims are barred, in whole or in part, because the alleged statements and conduct by Don Robinson are privileged, absolutely or qualifiedly, and protected by the First Amendment to the United States Constitution and similar provisions of any applicable state constitution or Canadian law.

117.     MRI's claims are barred, in whole or in part, because the alleged statements by Don Robinson are true, opinion, or both.

118.     MRI's claims are barred, in whole or in part, because the conduct of which MRI complains is permitted by express license, implied license, or both.

119.     MRI's claims are barred, in whole or in part, by the fair use doctrine.

120.     MRI's claims are barred, in whole or in part, because Don Robinson's conduct is privileged and justified as Don Robinson acted in fair competition with MRI.

121.     MRI's claims are barred, in whole or in part, by the applicable statutes of limitation, statutes of repose, or both.

122.     MRI's claims are barred, in whole or in part, by the contractual time limit for asserting such claims under the 2002 Agreement.

123.     MRI's alleged copyrightable works are not copyrightable due to the idea/expression dichotomy.

124.     MRI's copyright infringement and related claims are barred by the doctrine of copyright exhaustion.

125.     MRI's copyright infringement and related claims are barred by its failure to properly register the copyrights for its allegedly-infringed software.

126.     Don Robinson reserves the right to assert additional affirmative defenses that subsequently may become known to it through discovery or otherwise.

## Don Robinson's Counterclaim

In accordance with Federal Rule of Civil Procedure 13, Don Robinson, hereby pleads its counterclaim against MRI Software, LLC, as follows:

## Parties

1.      Don Robinson is a Canadian citizen who resides in Toronto.

2.      MRI Software, LLC, alleges that it is an Ohio limited liability corporation. For ease of reading, this counterclaim refers to MRI Software, LLC and all of its predecessors as "MRI."

## Jurisdiction

3.      To the extent one or more of the claims asserted in the Amended Complaint are within this Court's subject matter jurisdiction, this counterclaim also is within that subject matter jurisdiction.

4.      The Court has personal jurisdiction over MRI because it alleges that it is incorporated and headquartered in Ohio and it regularly does business in Ohio.

## Facts

### I.      Don Robinson Provides Exceptional Service To The Real Estate Industry

5.      From 1990 to 1998, Don Robinson was responsible for the Real Estate Systems consulting practice for Coopers & Lybrand in North America, where he completed numerous system selections for clients, many of whom implemented the MRI software.

6.      Don Robinson left Coopers & Lybrand and formed Lynx in 1998 as an independent software consulting firm to provide software implementation and customization services to real estate companies throughout North America.

7.      Since forming Lynx, all of Don Robinson's acts relating in any way to or in connection with MRI have solely and exclusively been in his role and capacity as an officer or director of the company.

8.      Leveraging Don Robinson's personal reputation in the real estate software and accounting industry and his relationships with the major software providers, including MRI and Yardi Systems, Inc., MRI's largest competitor, Lynx quickly became a go-to software consultancy for major real estate companies.

9.      Lynx's services include consulting with its clients to aid them in selecting the best property management software products for their particular needs and circumstances.

10.     There are several competing software providers in the market which Lynx's clients can choose among, including MRI, Yardi, Oracle Corporation (owns J.D. Edwards software), SAP, RealPage (also owns Spectre Computer Services Ltd. and other products), Constellation Software Inc., Angus Software, and Altus Corporation (owns Argus Software).

11.     After a client selects its software system, Lynx may work with that client to correctly install the software, migrate and convert existing data into the new system, train users, customize the system, and generate useful reports from the system.

12.     After the client's new system is up and running, Lynx may provide ongoing support to that client. Lynx's typical services include making customizations, generating standard and custom reports, troubleshooting, providing additional training and hotline support, and solving problems with the system.

13.     Lynx's overall support services are so effective that a number of MRI software users choose to pay for Lynx's support services even in cases where MRI support is provided by MRI, such that the client could have obtained support from MRI for no additional cost.

14.     As a result of the years of hard work by Lynx, it has gained an expertise in understanding and servicing property management software, with a reputation to match.

15.     Lynx also has gained a deep understanding of the specific software needs of Canadian property managers, which differs from the U.S. market due to different property laws, customs, and practices.

16.     Over the years, Lynx has earned a strong reputation for quality, service, expertise, responsiveness, creativity, integrity, reliability, and value.

## II.     The Lynx-MRI Relationship

17.     In 2000, MRI and Lynx entered into a written agreement under which Lynx would provide MRI-related services in Canada and the U.S. (the "2000 Agreement") on a non-exclusive basis.

18.     Don Robinson is not a party to the 2002 Agreement, and he does not have any relationship with MRI separate and apart from his position with Lynx.

19.     Prior to 2002, MRI had tried to independently sell its MRI property management software in Canada.

20.     However, MRI lacked knowledge of the Canadian real estate industry, and it was unwilling to make the financial investment necessary to gain that familiarity and to demonstrate a commitment to the Canadian market.

21.     Consequently, MRI's Canadian sales efforts failed and, by 2002, it had made very few Canadian sales.

22.     In 2002, MRI and Lynx discussed MRI's poor sales in Canada. Although Lynx had previously provided MRI with some sales assistance in Canada, MRI decided to take advantage of Lynx's knowledge of the Canadian market, its established relationships with Canadian property managers, and its reputation for providing high quality computer consulting services by making Lynx an authorized reseller of MRI software in Canada under a "MRI Product Sub-Licensor and Service Provider Agreement," which the parties signed in 2002 (the "2002 Agreement").

23.     Upon becoming a reseller, Lynx discovered that the MRI software was failing in the Canadian market because, among other reasons, it lacked features and functionality that the Canadian market and Canadian laws demanded and that competing software products offered.

24.     When Lynx suggested that MRI add the necessary functionality to its software, MRI told Lynx that MRI was not interested in making the investments necessary to do so.

25.     MRI assured Lynx, however, that – consistent with their prior agreements – if Lynx invested its own resources to customize the MRI software for the Canadian market, then Lynx would own those customizations.

26.     MRI assured Lynx that it could recoup its investments in designing and building the customizations by selling them and by providing other MRI-related consulting services through a long-term partnership with MRI.

27.     Relying on MRI's pledge that Lynx would own the customizations and that it would have a long-term business relationship with MRI, Lynx made substantial financial investments to build the necessary customizations.

28.     MRI knew, or should have known, that it would take Lynx years of selling those customizations and servicing MRI software to recoup Lynx's investment.

29.     With Lynx as its Canadian sales partner, MRI's Canadian sales grew significantly, with Lynx making substantial Canadian sales of MRI software.

30.     To provide MRI-related services and to be an effective MRI partner, MRI understood and agreed that Lynx would use MRI software, including MRI's "Application Toolkit" and its "Report Design Tool," to modify, customize, and enhance MRI software for Lynx clients and to build customized Lynx applications as add-ons to the MRI software.

31.     Thus, to enable Lynx to do its MRI-related work, MRI provided Lynx with MRI software and updates from 2000 until at least 2009.

## III.     **MRI Tries To Purchase Lynx's Customizations**

32.     From as early as 2003, Lynx has sold its customizations with MRI's full knowledge and approval.

33.     From as early as 2003 until after the date on which MRI contends the 2002 Agreement was terminated, MRI included Lynx's customizations as line items in numerous proposals to prospects and clients, with Lynx receiving the full revenue on its customizations. MRI materially benefited from Lynx selling its customizations along with the MRI software because it improved the marketability of the MRI software.

34.     Thus, for years, MRI acknowledged Lynx's rightful ownership of its customizations.

35.     Around 2007, MRI's U.S. sales team learned about a popular customization that Lynx had built for the Canadian market for condominium management (the "Condo Module").

36.     MRI's U.S. management expressed interest in working with Lynx to market this and other customizations in the U.S.

37.     MRI and Lynx then began to negotiate the terms of a business arrangement that would include Lynx's sale of the Condo Module in the U.S.

38.     During those negotiations, MRI again acknowledged Lynx's exclusive ownership of the Condo Module. MRI agreed that Lynx would invoice customers directly for the Condo Module and that Lynx would receive 100% of the revenues from the sale of the Condo Module and other Lynx products.

39.     MRI volunteered to draft an agreement reducing their oral discussions and agreements to writing, which the parties contemplated as an addendum to the 2002 Agreement.

40.     In December 2007, MRI provided Lynx with a written term sheet.

41.     Lynx rejected MRI's term sheet, however, because it did not match the parties' discussions and prior agreements, and it disproportionately favored MRI. Importantly, it appeared that MRI's term sheet, if signed, would require Lynx to transfer ownership of the Lynx customizations to MRI and give MRI ownership of future

customizations by Lynx, which were contrary to the agreed upon terms and their existing agreements.

42.     Despite Lynx's rejection of MRI's term sheet, Lynx and MRI continued to work together as partners promoting and selling MRI software.

43.     Lynx and MRI also continued to have discussions of a new or revised business agreement to govern their dealings going forward.

## IV.     MRI Purports To Cancel Its 2002 Agreement With Lynx

44.     In a March 30, 2009, letter from MRI's in-house attorney, MRI purported to have terminated the 2002 Agreement on November 9, 2008. Based on the 2002 Agreement's 180-day transition period, MRI's attorney contended that Lynx's rights under the 2002 Agreement would terminate on May 9, 2009.

45.     Despite that lawyer's letter, the MRI-Lynx partnership did not terminate on May 9, 2009.

46.     Rather, the relationship between MRI and Lynx continued. For example, MRI and Lynx continued to jointly promote and sell MRI software and Lynx's customization products, and Lynx continued to provide maintenance and support of MRI software with MRI's knowledge and consent, and MRI consented to Lynx's continued possession and use of certain MRI software products.

47.     Similarly, Lynx continued to independently sell its customizations with MRI's knowledge and consent.

48.     Well after May 9, 2009, MRI continued to hold Lynx out as MRI's "Partner" both to Lynx and to actual and potential customers of MRI software.

49.     For example, in a September 2009 MRI written proposal to Calloway Real Estate Investment Trust ("Calloway"), MRI specifically described Lynx as MRI's "Implementation Partner for Canada."

50.     MRI's written proposal to Calloway also identified specific Customizations (referred to in one instance as "Lynx Systems Enhancements") such as Central Address Book, Electronic Funds Transfer for AP, Pre-authorized Payments for AR, Post-dated Checques for CM, Retroactive Charge Adjustments for CM, PO – WO Link, EasyMerge and Enhanced Canadian Tax, as being Lynx's, not MRI's.

51.     MRI's written proposal to Calloway also included an entire section on "Software Customizations and Costs" that identified Lynx as the party responsible for many of the necessary Customizations.

52.     Lynx and MRI continued to work together with respect to MRI's written proposal to Calloway into 2010.

53.     MRI also held out Lynx as a "Partner" to numerous other actual and potential customers of MRI software after the alleged termination of the 2002 Agreement, including Tridel Corporation, Artis REIT, League Asset Corporation, Strategic Group, Knightstone, MARS, and Cominar.

54.     Furthermore, on May 8, 2009, MRI e-mailed a license "refresh" to Lynx that extended Lynx's access to and right to use the MRI software beyond the May 9, 2009, date on which MRI alleges that Lynx's rights to use the MRI software expired.

55.     Lynx also continued using the "MRI" name to promote MRI software and its own services on its website with MRI's knowledge and consent. In August 2009, for example, MRI sent Lynx the "latest" MRI logo for display on its website.

56.     Thus, the MRI-Lynx relationship and partnership continued long beyond the purported May 9, 2009, termination.

57.     The parties' conduct, written and oral statements and agreements, established business practices, course of dealing, course of performance, and trade usage formed independent agreements (or revisions, extensions, or revivals of prior agreements) that legally and equitably extended Lynx's rights to use MRI's software, including the MRI toolkit and report design tool, beyond May 9, 2009.

## V.    **MRI Files Suit**

58.     In 2010, Vista Equity Partners (a private equity firm) bought MRI.

59.     After that purchase, MRI did not terminate its relationship with Lynx, and Lynx continued to provide MRI-related services in accordance with the parties' prior and existing arrangements and agreements with MRI's knowledge and consent.

60.     After Vista's 2010 purchase, Lynx contacted MRI on numerous occasions regarding Lynx's MRI-related activities. In response, MRI did not indicate any objection to Lynx's business, including the specific conduct by Lynx about which MRI now complains, which was known to MRI at that time.

61.     MRI's knowledge of and consent to Lynx's MRI-related activities demonstrated that its new ownership was satisfied with MRI's existing relationship with Lynx.

62.     On May 2, 2012, without any prior indication that MRI believed Lynx had done anything improper since May 2009, MRI filed this lawsuit. Not once, in the three years prior to filing its lawsuit, did MRI inform Lynx that it objected to the ongoing conduct by Lynx that MRI now alleges as wrongful. As examples, after May 2009, MRI never objected to Lynx using the MRI name on its website, to Lynx selling Lynx customizations, or to Lynx providing support services for MRI software. To the contrary, MRI had full knowledge of Lynx's activities and consented.

63.     Upon information and belief, MRI began actively preparing to file this lawsuit against Lynx in or before December 2011. MRI's preparations included filing applications for registration of some or all of the copyrights it alleges in this case to have been infringed by Lynx.

64.     MRI filed applications for registration of certain copyrights in December 2011 in anticipation of filing a lawsuit against Lynx following issuance of registrations upon its applications by the U.S. Copyright Office.

65.     MRI did not inform Lynx that MRI believed it was violating any of MRI's rights between the filing of its copyright registration applications in December 2011 and its filing of this case on May 1, 2012.

66.     Indeed, despite a decade-long relationship and MRI's months-long preparation for litigation, MRI never sent a letter or e-mail to Lynx, and it never picked up the phone prior to filing its lawsuit to complain to Lynx about its business practices.

67.     MRI's Complaint contained 17 separate counts and comprised 280 numbered paragraphs and 55 pages.

68. On the same day it filed its complaint, MRI filed a motion for preliminary injunction and an over-length 31-page memorandum in support, which the Court has since stricken.

69. All told, MRI's May 2 filings constituted over 600 pages of documents.

70. Many or all of MRI's allegations and claims are factually and legally baseless.

71. As one example of MRI's factually and legally baseless claims, MRI claimd that Lynx violated the Digital Millennium Copyright Act (the "DMCA") by allegedly "misappropriating" passwords to enter the "myMRI Client Portal" without authorization. (*See* Compl. ¶ 143, 187-190.) This claim is baseless as a matter of fact and law. Factually, Lynx has not misappropriated any passwords or accessed the myMRI Client Portal without permission. Legally, even if MRI's untrue factual allegations were presumed true, the law is clear that such activities are not a violation of the DMCA.

72. MRI subsequently amended its DMCA claim to qualify its allegation that Lynx "circumvented MRI's technological measure(s) or provided the means to do so in order to access one or more Copyrighted Works without authorization from MRI" as being made "[u]pon information and belief" (*e.g.,* Compl. ¶ 188; Am. Compl. ¶ 204). MRI's amendment confirms that MRI did not have a good-faith basis for alleging a DMCA violation when it filed its Complaint on May 1, 2012, and further confirms that it has no actual knowledge or basis for alleging such a claim despite actively litigating this case for nearly 18 months.

73. As another example of MRI's factually and legally baseless claims, MRI claims that Lynx violated the Computer Fraud and Abuse Act ("CFAA") by "intentionally

accessing the myMRI Client Portal, without authorization." (*See* Compl. ¶ 176.) Like its DMCA claim, this claim is baseless as a matter of fact and law. Again, factually, Lynx has not accessed the myMRI portal without permission. Legally, even if MRI's untrue allegation were true, MRI failed to state a claim under the CFAA. MRI has not alleged the types of "damages" and "losses" required to trigger the CFAA because it has not alleged any destruction, corruption, deletion, or damage to its computer systems or the data stored on them.

74. On the same day MRI filed its lawsuit, May 2, MRI's CEO, David Post, sent e-mails to a number of Lynx's clients defaming Lynx and falsely accusing it of wrongdoing (the "Post E-Mail"). A true copy of the body of the Post E-Mail is attached as Exhibit A to Lynx's Counterclaim filed on June 15, 2012, as ECF#25.

75. Among the various false and defamatory statements about Lynx, the Post E-Mail states that:

a. Lynx "improperly . . . induce[s] MRI Software users not to renew -- and in some cases to violate -- their agreements with MRI, in favor of Lynx."

b. Lynx is "misappropriating MRI's assets."

c. Lynx is "infringing MRI's copyrights."

d. Lynx does not practice "fair play and ethical behavior."

e. Lynx has an "illegal business model."

f. Lynx "has engaged in an improper effort to undermine [MRI's] business."

76. By falsely stating that MRI customers using Lynx's services may be violating their MRI agreements, by falsely accusing Lynx of unlawful acts, and by encouraging Lynx's

clients needing "assistance" to contact MRI by e-mail or phone, the Post E-Mail is an obvious and improper effort to thwart competition in the market for consulting, service and support relating to MRI software and to scare Lynx's clients into moving their software support business from Lynx to MRI.

77. The Post E-Mail achieved its intended effect as Lynx's support services for MRI software has almost entirely ceased since the Post E-Mail.

78. Given the volume of MRI's filings, the approximately $170,000 in legal fees it has purportedly spent to initiate this suit, its months of preparation for this suit, and its choosing not to contact Lynx before filing this suit to attempt to resolve the matter without litigation, it is clear that MRI's intent is to use shock-and-awe litigation to force Lynx to expend enormous legal fees, to distract Lynx from its consulting work, and to try and justify sending notices to Lynx's clients tarnishing Lynx and scaring those clients into moving their business from Lynx to MRI.

79. Several different Lynx clients and a former MRI staffer have reported that MRI's David Post boasted that he would "shut Lynx down."

80. MRI's obvious goal is to use litigation as a club to put Lynx out of business to take all of Lynx's MRI-related consulting work.

81. In a further attempt to improperly restrain competition in the sale of products and services that are not within the scope of the privileges granted under copyright law, MRI has systemically required some or all of its customers to agree to not contract with any entity other than MRI to obtain support or other service relating to MRI

software without MRI's express authorization and agreement by the third party to onerous terms and conditions that benefit only MRI.

82. MRI admits that a representative example of the "typical" agreement MRI is requiring customers to sign has been filed by MRI under seal as Exhibit 3 to its Complaint.

83. The terms of MRI's agreements are intended to dissuade its customers from doing business with third parties like Lynx who provide service and support for MRI software for reasons other than protection of MRI's legitimate business interests.

84. MRI's new agreements have had a direct, negative effect in the market for third party service and support of MRI software products.

85. A number of MRI's customers have complained to Lynx and other third parties regarding the terms and conditions that MRI is imposing on its customers. Lynx is threatened with significant and irreparable harm, including harm to its business and reputation, as a result of MRI's conduct.

86. Claiming that it learned facts that could establish that Don Robinson has personal liability for the Lynx's acts and omissions alleged in MRI's complaint, MRI in May 2013 moved the Court for leave to amend its complaint to name Don Robinson as an additional defendant.

87. In moving the Court for leave, MRI admitted that it knew many of the facts on which it relied to assert personal liability against Don Robinson for nearly a year.

88. Upon information and belief, MRI sought leave to add Don Robinson as an additional defendant after nearly a year primarily as a way to increase its settlement leverage.

89.     As MRI stated in moving the Court for leave: "[I]n two subsequent discussions over the past few weeks, Lynx's counsel (John McLandrich) has repeatedly emphasized Lynx's insurer's refusal to contribute toward settlement any amount near what would be acceptable to MRI. Thus, both the grounds and need to add Mr. Robinson as a defendant have only recently become clear."

**Count One**
*Abuse of Process*

90.     Don Robinson incorporates by reference all allegations in all other paragraphs of this counterclaim as if fully rewritten herein.

91.     Don Robinson primarily contends that MRI has no probable cause for filing this lawsuit. However, in the event the Court decides that MRI's claims are supported by probable cause, Lynx pleads this counterclaim for abuse of process in the alternative under Rule 8(d).

92.     MRI has filed and maintained this action against Don Robinson with the ulterior motive of increasing its leverage for settlement in an ongoing suit against Lynx.

93.     Among other things, MRI has abused process by delaying the filing of its claims against Don Robinson for nearly a year after it learned of them, only to then seek leave to add them at a later time as a way to manufacture additional leverage to force a settlement of the case in its favor.

94.     By so doing, MRI has perverted this proceeding to accomplish an ulterior purpose for which it was not designed.

95.     As a direct and proximate result of MRI's abuse of process, Don Robinson has suffered damages in an amount to be determined at trial.

## Count Two
### *Declaratory Relief*
### *(Fair Use)*

96.     Lynx incorporates by reference all allegations in all other paragraphs of this counterclaim as if fully rewritten herein.

97.     Lynx's alleged acts of copyright infringement constitute fair use under 17 U.S.C. § 107 under at least the following considerations under 17 U.S.C. § 107: (a) Lynx's alleged acts of copyright infringement are transformative in developing new and particularly useful ways to use and interact with the MRI Software and, in particular, a user's non-copyrighted data within the MRI Software; (b) the nature of Lynx's works are supplemental to, not a substitute for, the MRI Software and are for accessing and interacting with its client's own data; (c) the amount of the MRI Software used was no more than was necessary; and (d) any effects on the market for MRI Software would be favorable to MRI by increasing the utility of its software and dissuading licensees from migrating to competing software systems.

98.     There is a substantial controversy as to whether Lynx's alleged acts of copyright infringement are protected as fair use, and Lynx has been harmed by MRI's pursuit of infringement claims for conduct by Lynx that qualifies as fair use.

99.     In accordance with the Declaratory Judgment Act, 28 U.S.C. 2201, Lynx requests that the Court declare that any alleged infringement of MRI's copyrights is protected as fair use under 17 U.S.C. § 107.

## Count Three
### *Declaratory Relief*
### *(Copyright Invalidity and Unenforceability)*

100.    Lynx incorporates by reference all allegations in all other paragraphs of this counterclaim as if fully rewritten herein.

101.    Registration of a copyright by the U.S. Copyright Office is a prerequisite for brining a claim of copyright infringement under United States law.

102.    At the time it filed its copyright registration applications in December 2011, MRI only had been issued a single copyright registration, Reg. No. TX0005447523, for a work entitled "MRI for Windows," which was first published on June 30, 2001.

103.    Upon information and belief, the work registered by "MRI for Windows" is different from the software known within MRI as "MRI Software v1.0." MRI did not apply for, and did not obtain, registration of the copyrights for "MRI Software v1.0."

104.    Other than "MRI for Windows," the MRI software having the earliest effective date of registration is "MRI Software v1.05" (Reg. No. 7-452-922) which identifies December 9, 1998, as the date of first publication.

105.    MRI registered the copyright for "MRI Software v1.05" as a derivative work, but did not identify the previous registration and year for the copyright from which that version was derived.

106.    Upon information and belief, the software for which MRI registered the copyright as "MRI Software v1.05" was written in a different programming language than the software registered by MRI as "MRI for Windows" and "MRI Software v1.05" is not a derivative work from the work registered by MRI as "MRI for Windows."

107.    The registration certificate for "MRI Software v1.4" (Reg. No. TX 7-453-183) claims a publication date of September 9, 2004, and the registration certificate for

"MRI Software v2.1.3" (Reg. No. TX 7-452-861) claims a publication date of July 21, 2004. Upon information and belief, the work registered by MRI as "MRI Software v1.4" was published before the work registered by MRI as "MRI Software v2.1.3."

108.    The registration certificate for "MRI Software v2.0" (Reg. No. TX 7-453-168) claims a publication date of May 10, 2005, and the registration certificate for "MRI Software V2.1.2" (Reg. No. TX 7-452-905) claims a publication date of November 7, 2003. Upon information and belief, the work registered by MRI as "MRI Software v2.0" was published before the work registered by MRI as "MRI Software v.2.1.2."

109.    The registration certificate for "MRI Software v2.1.4" (Reg. No. TX 7-453-173) claims a publication date of February 5, 2005. Upon information and belief, the work registered by MRI as "MRI Software v2.1.4" was published after the work registered by MRI as "MRI Software v2.0."

110.    Upon information and belief, MRI published a version 2.1 and a version 2.1.1 of its software but did not register the copyright for either of those versions.

111.    Upon information and belief, MRI published versions 3.0 SP1 and 3.0 SP2 of the MRI Software on or before May 18, 2006, the date claimed as the date of publication for "MRI Software v3.0 SP3" on Registration Certificate TX 7-452-798. MRI did not apply for or obtain registration of the copyrights for versions 3.0 SP1 or 3.0 SP2 of the MRI Software.

112.    Each of MRI's copyright registrations subsequent to the registration for "MRI for Windows" claims copyrights in and to a derivative work. Other than the registration for "MRI Software v4.4," none of MRI's derivative work registration certificates identify the previous registration and date for the copyrights for the work from which it was derived.

113. Because MRI failed to register the copyright for version 1.0 of the MRI Software and each derivative version of the MRI Software published by MRI, and because MRI failed to provide all of the necessary and required information for registration of the derivative versions of its software that it did register, including the previous registrations and years for each work from which a registered work was derived, the registrations for the copyrights that MRI alleges have been infringed are invalid and unenforceable against Lynx in this litigation.

114. There is a substantial controversy as a result of the invalidity and unenforceability of MRI's copyright registrations, and Lynx has been harmed, and is threatened with additional and irreparable harm, as a result of the invalidity and unenforceability of MRI's copyright registrations.

115. In accordance with the Declaratory Judgment Act, 28 U.S.C. 2201, Lynx requests that the Court declare that MRI's copyrights are invalid and unenforceable.

### Count Four
*Declaratory Relief*
*(Copyright Misuse)*

116. Lynx incorporates by reference all allegations in all other paragraphs of this counterclaim as if fully rewritten herein.

117. MRI claims to hold copyrights the software and related products that it offers for sale in interstate commerce.

118. By requiring customers to sign agreements that purport to substantially restrict their ability to contract with third parties for service and support and by filing and maintaining this objectively baseless lawsuit, in bad faith, MRI is attempting to obtain an

unfair commercial advantage and unlawfully attempting to secure rights that are not within the scope of the privileges granted under copyright law.

119.    MRI also has attempted to obtain an unfair commercial advantage and unlawfully secure rights that are not within the scope of the privileges granted under copyright law by attempting to use its copyrights to block licensees of those rights from accessing or allowing third parties to access the licensee's data that are neither copyrightable nor copyrighted.

120.    MRI's conduct accordingly constitutes an unlawful attempt to extend the scope of its exclusive rights under the copyright laws. MRI's conduct further violates the public policy underlying the copyright laws.

121.    There is a substantial controversy as a result of MRI's copyright misuse and its claim that Lynx (and MRI's customers) have infringed MRI's copyrights. Both Lynx and MRI's customers have been harmed, and are threatened with additional and irreparable harm, as a result of MRI's conduct.

122.    In accordance with the Declaratory Judgment Act, 28 U.S.C. 2201, Lynx requests that the Court declare that MRI's copyrights are unenforceable due to MRI's copyright misuse.

## Prayer for Relief

**WHEREFORE**, having fully answered the Amended Complaint and pleaded its counterclaim, Lynx prays for judgment against MRI as follows:

(A)    Dismissal of the Amended Complaint and all claims pled against Lynx.

(B)    Compensatory damages in an amount to be determined at trial.

(C)     An accounting and disgorgement of MRI's ill-gotten profits.

(D)     Punitive damages.

(E)     Attorneys' fees.

(F)     Pre-judgment and post-judgment interest.

(G)     Costs of the action.

(H)     Preliminary and permanent injunctive relief, barring MRI from committing any of the wrongful acts cited in this Counterclaim.

(I)     A declaration that any infringement of MRI's copyrights by Lynx is protected as fair use.

(J)     A declaration that MRI's copyrights are invalid and unenforceable due to MRI's failure to properly register its copyrights with the U.S. Copyright Office.

(K)     A declaration that MRI's copyrights are unenforceable against or with respect to Lynx due to MRI's copyright misuse.

(L)     Such other and further relief as allowed at law or in equity that the Court deems appropriate and to which Lynx is entitled.

Respectfully submitted,

Dated: October 14, 2014

    /s/ David T. Movius

David T. Movius (OH 0070132)
  *dmovius@mcdonaldhopkins.com*
Matthew J. Cavanagh (OH 0079522)
  *mcavanagh@mcdonaldhopkins.com*
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474

and

John T. McLandrich (OH 0021494)
  *jmclandrich@mrrlaw.com*
MAZANEC, RASKIN & RYDER CO., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, Ohio 44139
t 440.248.7906 │ f 440.248.8861

*Counsel for Donald Robinson*

## Jury Demand

Donald Robinson hereby demands a jury trial on all issues triable thereby.

     /s/ David T. Movius
*Counsel for Lynx Systems, Inc.*

## Certificate Of Service

I hereby certify that, on October 14, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

_____/s/ David T. Movius_____
*Counsel for Lynx Systems, Inc.*
